# Illinois Official Reports

## Supreme Court

### People v. Fernandez, 2014 IL 115527

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAVIER FERNANDEZ, Appellant. |
| Docket No. | 115527 |
| Filed | March 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Evidence that defendant and his companion drove around looking for cars to break into and that the companion shot at a policeman who discovered him in the act of breaking in was sufficient to convict the defendant on an accountability theory for aggravated discharge of a firearm in the direction of a peace officer, even though the defendant claimed he did not know the companion was armed—common design rule. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Michael Brown, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael James McDermott, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield and Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People. |

Justices                JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Javier Fernandez was found guilty by accountability of one count of burglary (720 ILCS 5/19-1(a) (West 2008)) and two counts of aggravated discharge of a firearm in the direction of a peace officer (720 ILCS 5/24-1.2(a)(3) (West 2008)). The trial court merged defendant's convictions into a single count of aggravated discharge of a firearm in the direction of a peace officer and sentenced him to 12 years in prison. Defendant appealed, and the appellate court affirmed. 2012 IL App (1st) 101913-U. Defendant appealed again to this court, and we allowed his petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Aug. 15, 2006). The sole issue before this court is whether the evidence supports defendant's aggravated discharge of a firearm conviction. We hold that it does.

¶ 2                              BACKGROUND
¶ 3    Officer Claudio Salgado of the Chicago police department testified that, on the morning of January 20, 2008, he pulled his car into a church parking lot located underneath the Dan Ryan Expressway. He was off-duty but wearing both his police badge and sidearm. As he exited his car, Officer Salgado heard the sound of breaking glass. He moved toward the sound and saw a man (Gonzalez) reaching into a parked car through a broken window. Officer Salgado displayed his badge and three times yelled "Chicago police." Gonzalez pulled himself out of the parked car, faced Officer Salgado, and began walking backward toward a maroon SUV that defendant was driving. Defendant began driving the SUV slowly toward Gonzalez. When defendant stopped the SUV, Gonzalez ran to the passenger side, opened the door, and stepped up onto the running board. Gonzalez then pulled a gun and fired three shots over the SUV's hood at Officer Salgado, who was now standing about 15 feet from Gonzalez. Officer Salgado immediately returned fire as the SUV sped away. Although Officer Salgado initially believed that he fired four or five shots, he later learned that he fired seven shots and that three of them struck defendant. After defendant and Gonzalez fled the scene, Officer Salgado returned to his car to give chase. Upon seeing a parked Cook County sheriff's vehicle, Officer Salgado stopped, identified himself, and explained the situation. The sheriff's officers told Officer Salgado to stay there and wait for backup while they pursued the SUV. Later that day and again the following evening, Officer Salgado identified both defendant and Gonzalez from a photo lineup.

¶ 4    Defendant's sister, Marial Fernandez, testified that, on the morning of January 20, 2008, defendant borrowed her red Nissan Xterra to run some errands. That afternoon, she called defendant and told him that she needed her SUV back. Shortly thereafter, defendant returned home without the SUV and told her that some "gangbangers" had shot at him while he was driving it. Defendant appeared ill, was very pale, and was bleeding from his hand. Defendant

- 2 -

told Marial that he had left her SUV at the intersection of 51st Street and Winchester Avenue, but when Marial went to that location, the SUV was not there. Marial then called the police, who arrived at the location and spoke with her. The next day, Marial was called to police headquarters and informed that her brother had been arrested, that he had undergone surgery for being shot, and that her SUV had been recovered. When Marial went to retrieve her SUV, she saw that it had bullet holes in several places.

¶ 5    Florencio Diaz testified that, on January 20, 2008, defendant called him around noon and asked to meet at Diaz's house. Diaz arrived at his house about 10 minutes later and found defendant and Gonzalez waiting for him. Diaz noticed that the tricep area of defendant's arm was hanging open, and defendant explained that he had been in a shootout with gangbangers. Defendant also stated that he was not going to a hospital because he did want to get the police involved. When defendant and Gonzalez left Diaz's house, they left the bullet-riddled SUV parked in Diaz's backyard. Later that day, Diaz was taken into a police station and shown a photo array. He identified defendant and Gonzalez as the two men who had been in his house.

¶ 6    Chicago police detective Greg Swiderek testified that, at approximately 2 a.m. on January 21, 2008, he was conducting surveillance outside an apartment belonging to Gonzalez's girlfriend, Mylene Parks. When he saw Gonzalez exit the apartment, Detective Swiderek announced "police" and ordered Gonzalez to stop. Instead, Gonzalez ran back into the apartment and slammed the door. A few seconds later, and along with several other officers, Detective Swiderek entered the apartment by force. Inside the apartment, Detective Swiderek found and arrested both defendant and Gonzalez. Detective Swiderek also found "an IV that you'd seen in a hospital" hanging from the shower curtain rod in the apartment's bathroom.

¶ 7    Chicago police detective Paul McDonagh testified that he interviewed defendant shortly after he was taken into custody. At the time of the interview, defendant had professional looking bandages covering his arm and finger. In reference to the bandages, Detective McDonagh asked defendant what had happened. Defendant replied that somebody had shot at his car, though he could not remember who or where. Detective McDonagh then asked defendant what hospital he had gone to for treatment. Defendant responded that he had not gone to a hospital but rather had his wounds treated by Mylene Parks. At that point, Detective McDonagh arranged for defendant to be transported to Mount Sinai Hospital.

¶ 8    After returning from Mount Sinai, defendant gave a signed written statement to the police. In that statement, defendant stated that, around 7 a.m. on January 20, 2008, Gonzalez came to defendant's apartment asking for money. Defendant told Gonzalez that he didn't have any money, and the two men left the apartment together in a burgundy SUV owned by defendant's sister. Gonzalez asked defendant to drive to the Maxwell Street Market so that Gonzalez could break into parked cars to get money. Defendant drove to the Maxwell Street Market as requested, but there were no cars parked there because the market was closed. The two men continued driving and noticed a church parking lot under the Dan Ryan Expressway that had cars parked in it. Gonzalez told defendant to pull into the church parking lot, and defendant complied. Defendant then remained in the SUV while Gonzalez got out. Gonzalez then broke the window of a parked car and began trying to steal the car's radio. As this was happening, defendant noticed that a man holding a gun was approaching the car that Gonzalez was breaking into. Gonzalez noticed this, too, and pulled himself out of the car he was breaking into and ran to the back of the SUV that defendant was driving. At that point, the man with the

gun yelled, "Police. Stop." Defendant pulled out of the parking lot and heard gunshots as he drove away. As he reached the street, defendant noticed that Gonzalez was now back in the front seat of the SUV.

¶ 9 Defendant further stated that, once out of the parking lot, he realized for the first time that he had been shot. Gonzalez told defendant not to go to the hospital. Instead, the two men went to pick up Gonzalez's car. After doing so, defendant and Gonzalez drove to Diaz's house, where they parked the SUV. Defendant then called his sister, Mariel, and told her that gang members had shot at him and that her SUV was parked at 51st and Winchester, both of which were lies. Gonzalez then drove defendant home, where defendant again told Mariel the same lies. At that point, Mariel called the police. Later that day, Gonzalez called defendant and told defendant that he would pick him up so that Mylene Parks could treat his wounds. The two men then went together to an apartment at Foster and Damen Avenues, where Mylene cleaned defendant's wounds and gave him an IV to hydrate him. Eventually the police arrived, and after trying unsuccessfully to pretend that they were not there, defendant and Gonzalez were arrested.

¶ 10 Based on this evidence, the circuit court of Cook County found defendant guilty by accountability of one count of burglary and two counts of aggravated discharge of a firearm in the direction of a peace officer. The trial court merged defendant's convictions into a single count of aggravated discharge of a firearm in the direction of a peace officer and sentenced him to 12 years in prison. Defendant filed a timely appeal, and the appellate court affirmed. 2012 IL App (1st) 101913-U. We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Aug. 15, 2006).

¶ 11                                                    DISCUSSION

¶ 12 In this court, defendant argues that we must reverse his conviction for aggravated discharge of a firearm in the direction of a peace officer. In support, defendant maintains that in order to prove him guilty of that offense under a theory of accountability, the State was required to prove that defendant possessed the specific intent to promote, solicit, aid, or attempt to aid the commission of that particular offense. Here, however, the State failed to produce any evidence showing that defendant even knew Gonzalez had a gun, let alone that he knew that Gonzalez would discharge that gun in the direction of a police officer. According to defendant, if he did not know that Gonzalez was armed, "it must logically and legally follow that [he] could not have specifically intended to promote, solicit, aid, or attempt to aid an offense which—by necessity—the principal must be armed in order to commit, to wit Aggravated Discharge of a Firearm."[1]

¶ 13 We reject defendant's argument. Section 5-2(c) of the Criminal Code of 1961 provides that a person is legally accountable for the criminal conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or

---

[1]In making this argument, defendant does not contest his burglary conviction, which was also established by accountability. On the contrary, defendant concedes that his signed statement is "clear evidence of guilt as to Burglary" because it "clearly illustrates that Gonzalez announced his intention to burglarize cars before arriving at the church parking lot."

- 4 -

commission of the offense." 720 ILCS 5/5-2(c) (West 2008). This court has long recognized that the underlying intent of this statute is to incorporate the principle of the common-design rule. *People v. Terry*, 99 Ill. 2d 508, 515 (1984). Thus, to prove that a defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). Under the common-design rule, if "two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *Id.* "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *Id.* at 338. Upon review of a question as to a defendant's accountability for an offense, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cooper*, 194 Ill. 2d 419, 424-25 (2000).

¶ 14 A textbook application of the common-design rule can be found in *People v. Kessler*, 57 Ill. 2d 493 (1974). In *Kessler*, the evidence showed that Kessler planned with two other men to burglarize a tavern after hours. Kessler waited in the front passenger seat of a car outside the tavern while his two unarmed companions entered the building. While inside the tavern, the two companions were surprised by the tavern's owner, and one of them shot and wounded him with a gun found during the burglary. The two companions then returned to the car where Kessler was waiting, and the three men sped away. The police gave chase, and eventually the fleeing car was forced off the road. At that point, the two companions exited the car and attempted to flee on foot, while Kessler continued to remain in the car. While attempting to flee on foot, one of the companions shot at a pursuing police officer. Kessler was arrested and found guilty by accountability of both the burglary and the attempted murders of the tavern owner and the pursuing police officer. *Id.* at 494-95.

¶ 15 Kessler appealed, and the appellate court reversed his attempted murder convictions. *People v. Kessler*, 11 Ill. App. 3d 321 (1973). The court framed the issue as "whether Kessler can be found guilty on accountability principles without proof of his specific intent to commit the attempt murders perpetrated by [his companions.]" *Id.* at 325. In holding that he could not, the court first looked at section 5-2(c) of the Code and determined that "[u]nder the plain language of the statute, one cannot be held accountable unless found to have the specific intent to commit or aid in the commission of the substantive crime for which he is being held accountable." *Id.* The court then went on to say that "except in felony-murder cases, the Code does not impose liability on accountability principles for all consequences and further crimes which could flow from participation in the initial criminal venture, absent a specific intent by the accomplice being held accountable to commit, or aid and abet the commission of, such further crimes." *Id.* at 325-26. Finally, the court held that "application of the 'common design' principle is not justified by the language of section 5-2 to hold a defendant accountable for crimes committed by an accomplice which the defendant was not shown to have intended." *Id.* at 327.

¶ 16    The State appealed to this court, and this court rejected the appellate court's reasoning in its entirety. Indeed, this court held that, "as it reads," section 5-2 of the Code "means that where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses *any criminal act done in furtherance of the planned and intended act*." (Emphasis added.) *Kessler*, 57 Ill. 2d at 497. Applying that principle to the facts before it, the court then concluded that Kessler's attempted murder convictions were proper:

> "[T]he burglary was the offense which [Kessler and his companions] had jointly planned and were jointly committing, and each was legally accountable for the conduct of the other in connection therewith. The result was the offense of attempted murder of Louis Cotti, the tap owner, and of State Trooper Max L. Clevenger, who answered a report of the incident and who tried to apprehend the fleeing parties." *Id.* at 499.

In other words, once Kessler agreed to participate in burglary, he was liable under section 5-2(c) for every criminal act committed "in connection therewith," including the unplanned shootings committed by his initially unarmed companions.

¶ 17    We see no material distinction between the facts of *Kessler* and the facts presently before us. More than that, we find it difficult to conceive of two unrelated cases that are more factually alike than these two. As in *Kessler*, defendant here entered into a plan to commit a burglary with a companion he claims he did not know was armed. As in *Kessler*, defendant here waited in the car while his companion committed the actual burglary. As in *Kessler*, defendant's companion was interrupted unexpectedly during the commission of the burglary and shot at the person who happened upon the scene. And as in *Kessler*, defendant and his companion sped away from the scene together in a car traveling at high speed. Indeed, as we see it, the only meaningful differences between the facts of this case and the facts of *Kessler* involve what happened *after* the shooting, and without question those differences make things worse for defendant, not better. Kessler was a passenger in the getaway car and remained at all times in the car, even while his companions attempted to flee on foot. Defendant, by contrast, drove the getaway car and kept in close company with Gonzalez for several hours up until the time of their arrests. During those hours, defendant not only failed to report the shooting but also took several steps to conceal it, including lying to both his sister and Diaz about how he'd been shot, hiding the bullet-riddled SUV, and seeking medical attention from Mylene Parks rather than going to a hospital. All of these facts are relevant to the determination of whether a common criminal design exists, and none of them undermines the trial court's conclusion that there was. See *People v. Perez*, 189 Ill. 2d 254, 267 (2000) ("Proof that the defendant was present during the perpetration of the offense, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability.").

¶ 18    In its brief before this court, the State begins by arguing that, "by conceding his guilt for the burglary, under the facts of this case, defendant has effectively conceded his guilt for aggravated discharge of a firearm." This is exactly right. As *Kessler* clearly establishes, section 5-2(c) means that where one aids another in the planning or commission of an offense, that person is legally accountable for the conduct of the person he aids; and that the word "conduct" encompasses any criminal act done in furtherance of the planned and intended act. Here,

defendant concedes that he aided Gonzalez in the planning and commission of the burglary. That being the case, defendant is legally accountable for *any criminal act* that Gonzalez committed in furtherance of the burglary, which in this case was the aggravated discharge of a firearm in the direction of a peace officer. Under well-settled accountability principles, the evidence in this case more than supports defendant's conviction.

¶ 19    In reaching this result, we readily acknowledge that though defendant's argument is utterly precluded by *Kessler* and its progeny, it is not without legal support. On the contrary, defendant relies heavily upon *People v. Phillips*, 2012 IL App (1st) 101923, a recent decision that effectively resurrects the appellate court's reasoning in *Kessler*. In *Phillips*, the defendant was driving his car when he nearly collided with another car that was making a U-turn. The two cars then stopped and faced each other, each blocking the other's way. At that point, the defendant's passenger, Sanders, got out of the defendant's car and began shooting at the other car. When the shooting was over, Sanders got back into the defendant's car, and the two men drove away. In reversing the defendant's convictions for aggravated battery with a firearm and aggravated discharge of a firearm, both of which were obtained under a theory of accountability, the appellate court initially held that the State's evidence was insufficient to show that the defendant knew Sanders intended to commit a crime when Sanders exited the defendant's car. *Id.* ¶¶ 20-21. From there, the court went on to add:

> "Even if we were to assume that defendant intended to help Sanders commit some crime against the victims, he cannot logically have intended to help Sanders commit a crime that he does not know is possible. *If defendant did not know that Sanders had a gun, then regardless of what else defendant may have done he cannot have intended to help Sanders commit a crime that necessarily requires a firearm, and he therefore cannot be accountable for it.*" (Emphasis added.) *Id.* ¶ 22.

Not surprisingly, defendant here attaches a great deal of weight to this latter statement from *Phillips*. The problem is, this statement reflects the very reasoning that this court rejected 40 years ago in *Kessler*, and it is flatly at odds with this court's well-settled accountability jurisprudence. Again, in *Kessler*, this court expressly held that, under section 5-2(c), "where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act." And significantly, in *Kessler*, just as in *Phillips*, the defendant was convicted by accountability of firearm offenses committed by someone the defendant did not know was armed. Similarly, in *People v. Tarver*, 381 Ill. 411 (1942), this court held that where there is a common design to do an unlawful act, then "whatever act any one of them [does] in furtherance of the common design is the act of all, and all are equally guilty *of whatever crime was committed.*" (Emphasis added.) *Id.* at 416; see also *People v. Rodriguez*, 229 Ill. 2d 285, 289-91 (2008) (collecting cases, including *Kessler* and *Tarver*). In other words, there is no question that one can be held accountable for a crime other than the one that was planned or intended, provided it was committed in furtherance of the crime that *was* planned or intended. To the extent that *Phillips* holds or suggests otherwise, it is hereby overruled.

¶ 20    As a final matter, we wish to address briefly our decisions in *People v. Dennis*, 181 Ill. 2d 87 (1998), and *People v. Taylor*, 186 Ill. 2d 439 (1999), as a fundamental misunderstanding of those decisions drove the errant analysis in *Phillips*. In essence, *Phillips* reads *Dennis* and

*Taylor* as establishing a blanket principle that a person cannot be held accountable for a crime that he or she did not know would occur and therefore could not have intended to facilitate. However, this is not what these cases say. In both *Dennis* and *Taylor*, the defendant was the driver of a car whose passenger, *wholly unbeknownst to the defendant*, intended to commit a crime. And in both cases, the defendant was convicted of the passenger's crime by accountability based principally on the fact that the defendant drove the passenger away from the scene of the crime after its commission. In reversing Dennis's conviction, this court explained:

> "Holding a defendant who neither intends to participate in the commission of an offense nor has knowledge that an offense has been committed accountable does not serve the [accountability] rule's deterrent effect. Further, the attachment of liability in such situations contravenes general concepts of criminal culpability." *Dennis*, 181 Ill. 2d at 105.

In reversing Taylor's conviction, this court invoked *Dennis* and further explained both that "a person may not be held accountable for a crime merely for being present, even when that person knows that a crime is being committed," and that "a person generally will not be deemed accountable for acquiescing to the criminal activities of another." *Taylor*, 186 Ill. 2d at 446.

¶ 21    From these and related principles, the court in *Phillips* concluded that a defendant may *never* be held accountable for a crime that he did not specifically intend to promote or facilitate. See *Phillips*, 2012 IL App (1st) 101923, ¶ 30 ("[e]ven if the evidence showed that defendant deliberately trapped the victims and plotted to commit some crime against them, there is no evidence that he intended to help Sanders attack them *with a firearm*" (emphasis in original)). As we have demonstrated, however, this is an erroneous characterization of the law. What *Phillips* overlooked is that, while *Taylor* and *Dennis* are indeed accountability cases, they are not common-design rule cases. Rather, they are specific intent cases. Again, it is well settled that, under the Illinois accountability statute, the State may prove a defendant's intent to promote or facilitate an offense by showing *either* (1) that the defendant shared the criminal intent of the principal, *or* (2) that there was a common criminal design. *In re W.C.*, 167 Ill. 2d at 337. *Taylor* and *Dennis* are cases involving the first of these categories, namely shared intent. In both of those cases, the evidence clearly showed that the defendants had no idea that *any crime* was going to be committed, let alone the one that actually was committed. See *Dennis*, 181 Ill. 2d at 92, 105; *Taylor*, 186 Ill. 2d at 446. Thus, in these two cases, the court appropriately focused upon what these defendants knew about their passengers' criminal intentions, as one cannot share an intent to promote or facilitate the commission of a crime when one doesn't even know that a crime is going to be committed. However, this emphatically is *not* the rule in common-design rule cases, where by definition the defendant intentionally sets out to promote or facilitate the commission of a crime. In common-design rule cases, the rule is and remains that of *Kessler*, namely, that "where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act." *Kessler*, 57 Ill. 2d at 497. Conflating these two distinct accountability schemes—shared intent and common design—is where *Phillips* went astray,

and we hereby correct that mistake so that similar missteps are avoided going forward.

¶ 22                                 CONCLUSION
¶ 23          For the foregoing reasons, the judgment of the appellate court is affirmed.

¶ 24          Affirmed.