# Illinois Official Reports

## Appellate Court

*People v. Ivy*, 2015 IL App (1st) 130045

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PIERCE IVY, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-0045 |
| Filed | August 6, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-24686; the Hon. Angela M. Petrone, Judge, presiding. |
| Judgment | Reversed in part, affirmed in part; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Kate E. Schwartz, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Kathleen Warnick, and Yvette Loizon, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1        On May 20, 2006, a shooting outside an apartment building at 308-310 East 68th Street in Chicago left Steven Christopher Willis (Chris) dead and Mashan Willis (Shawn), Maurice Webb, and Roger Garland injured. Defendant Pierce Ivy was one of at least three shooters present that night and, after a bench trial, he was convicted of the first-degree murder of Chris, as well as the attempted murders of Shawn, Webb, and Garland. He was sentenced to a combined 120 years' incarceration for those offenses. His codefendant, Giovanni Cunningham, was tried in a separate bench trial.

¶ 2        On appeal, defendant does not challenge his convictions for the attempted murders of Shawn or Roger Garland. Instead, defendant claims that the State failed to prove him guilty beyond a reasonable doubt of the attempted murder of Maurice Webb or the murder of Chris. Defendant also asks us to correct his mittimus to reflect the correct number of days he spent in custody prior to his sentencing.

¶ 3        As explained below, we reverse defendant's conviction for the attempted murder of Webb, which was based on an accountability theory. None of the evidence at trial proved that Webb was shot by someone acting in furtherance of a common criminal design shared by the defendant and the other shooters at the scene. However, we affirm defendant's conviction for the first-degree murder of Chris. Two witnesses identified defendant as the man who shot Chris to the police and to the grand jury. While these witnesses recanted those statements at trial, the trial court was better-positioned to assess the credibility of their prior statements versus their trial testimony. Moreover, their prior statements were corroborated by other evidence in the case. We also correct defendant's mittimus to reflect the 1,844 days he spent in custody before he was sentenced.

¶ 4                                    I. BACKGROUND

¶ 5        Because defendant challenges the sufficiency of the evidence against him, we must discuss the State's evidence in detail. At the outset, we will briefly summarize the undisputed facts for clarity's sake. Around 10:20 p.m. on May 20, 2006, a group of people were hanging out in front of an apartment building located at 308-310 East 68th Street in Chicago. Garland, Chris, and Shawn were among this group. Defendant, his friend Benny Love, and codefendant Giovanni Cunningham were also present. A man named "Fella" was also present, although the parties dispute whether Fella was Webb or someone else. At some point during the night, defendant shot Shawn and Garland. But defendant was not the only individual who fired a gun.

¶ 6        Garland testified that, on May 20, 2006, he was hanging out with Shawn and Chris outside the apartment building. Garland saw defendant and Benny Love pull Shawn toward an alley next to the building. Love and Shawn were arguing with each other, but neither of them threw any punches or drew any weapons. Garland and Chris pulled Shawn back out of the alley, and they returned to the front of the building. Garland testified that Shawn was standing inside the hallway of the apartment building and Chris was just outside the door. Garland testified that neither he, Shawn, nor Chris was armed.

¶ 7        Garland testified that he "felt the presence of" someone behind him, so he turned around. He saw defendant, who lifted his shirt, pulled out a gun, and shot him five times in his hips,

lower back, lower legs, and knee. Garland fell to the ground. As Garland was lying on the ground, defendant stepped over him, approached Shawn, and shot Shawn in the face. Defendant then ran west. Moments later, Garland heard more gunshots.

¶ 8       Tawanda Chiestder testified that she did not remember any of the events of May 20, 2006. She also claimed that she did not remember speaking to the police or any assistant State's Attorneys regarding the shooting. Chiestder had been convicted of attempted armed robbery and armed robbery in 2010, offenses for which she was incarcerated at the time of trial. She had also been convicted of possessing a controlled substance in 2008.

¶ 9       Assistant State's Attorney Jennifer Bagby was called to testify about Chiestder's testimony before the grand jury. According to Ms. Bagby, Chiestder told the grand jury that, on the evening of May 20, 2006, she was in the area of 308-310 East 68th Street. Shawn and Chris were among the group of people hanging out in that area and drinking. Chiestder heard people arguing in the alley next to the building. During the argument, she heard defendant yelling. Chiestder saw defendant pull out a gun and shoot Shawn in the face near the alley running next to 308-310 East 68th Street. After seeing defendant shoot Shawn, Chiestder ran into the apartment building. She looked out a small window on the door of the building and saw defendant stand over Chris on the corner of 68th Street and Prairie Avenue and shoot him three times. Before the grand jury, Chiestder admitted that she initially told the police that someone named "Pig" was the shooter, but said that she had lied because someone named "Outlaw" threatened to kill her if she did not accuse Pig.

¶ 10      Assistant State's Attorney Scott Spiegel testified as to the contents of a written statement Chiestder had given to him on May 20, 2006 at the Area 2 police station. In that statement, Chiestder said that she had been friends with Chris and Shawn. She said that "Chris was known by the name of Fella on the street." The remainder of Chiestder's statement to Spiegel conformed with her grand jury testimony, as recounted by Ms. Bagby.

¶ 11      Frederick Davis, who was serving one year for a drug offense in Wisconsin at the time of trial, testified that, on May 20, 2006, there was a shooting, but he did not see who did it. Davis said that, once he heard gunfire, he ran upstairs into the building at 308-310 East 68th Street and did not see who was shooting. Davis remembered speaking to a detective and an assistant State's Attorney after the shooting and acknowledged that he signed a statement he gave to the police. After viewing photographs of individuals attached to his statement, Davis recognized them as people on the street during the shooting, but he said that he did not remember telling the police that any of those people shot anyone. Davis also did not remember testifying before the grand jury on November 15, 2007. Davis said that, on the evening of May 20, 2006, he was high on marijuana.

¶ 12      In Davis's statement, which the State introduced at trial, Davis said that, on May 20, 2006, Davis was with his friend Giovanni at 308-310 East 68th Street. Davis went to the stoop of the building, but Giovanni went to the alley next to the building, where he spoke to defendant and a man named "Fella." Davis said that Fella told Giovanni that the man "that killed your daddy out [*sic*] here," and that Fella motioned to Shawn. Fella told Giovanni to calm down, but Giovanni ran to a mailbox at a nearby building and took out two handguns: a 9-millimeter Glock and a "45." Davis said that he heard defendant tell Giovanni, "Shorty, give me that gun. I'm gonna [*sic*] show you how a real [original gangster] gets down." Davis said that Giovanni handed defendant the 9-millimeter and kept the "45." Defendant then walked over to Shawn and shot him in the face. As Davis tried to run inside the building, he

saw defendant chase another man, whom Davis did not know, toward Prairie Avenue and shoot him. Once inside the building, he heard more than one gun being fired but did not see who else was shooting other than defendant. Davis said that he later saw that Fella had been shot as he was trying to get into the building.

¶ 13    Davis also testified before the grand jury on November 15, 2007. His grand jury testimony largely mirrored his statement to the police. However, Davis told the grand jury that Giovanni had also given a .357-caliber handgun to Fella before the shooting. Davis also testified that, while he saw defendant shooting in the direction of the person defendant chased across the street, he did not see that person actually fall down. Davis testified that, after the shooting, he saw the .357 handgun next to Fella.

¶ 14    Officer James Norwood of the Chicago police department testified that he was on patrol near 67th Street and Indiana Avenue on May 20, 2006. Around 10:25 p.m., Norwood heard gunshots coming from the east. As he drove toward the shots, he saw the flash from the muzzle of a gun, which appeared to be aiming down toward the sidewalk. Norwood estimated that anywhere from two to four people were near the gunfire. Norwood and his partner drove toward the flash and, as he approached the scene, people fled in several different directions. Norwood pursued one man who ran west on 68th Street. After catching this man, Norwood learned that his name was Benny Love. Norwood saw two other men run east and jump a fence, but he did not pursue those men.

¶ 15    Officer Eric Ruhnke of the Chicago police department was also patrolling the area near 308-310 East 68th Street on May 20, 2006. Before the shooting, Ruhnke saw a group of 7 to 10 people standing on the street near that address. He told them to get out of the street, then he drove away. Near the intersection of Calumet Avenue and 69th Street, Ruhnke heard multiple gunshots coming from the area where he had seen the group of people. Ruhnke and his partner drove back to 308-310 East 68th Street, where he saw four people who had been shot. One person was at the corner of 68th Street and Prairie Avenue. Another was lying on the sidewalk in front of 308-310 East 68th Street, "complaining that he had been shot" and asking for help. Two more victims were just inside the door to the apartment building at 308-310 East 68th Street. These two victims were lying so close to each other that they were touching.

¶ 16    Charles McGee testified that he lived at the corner of 68th Street and Calumet Avenue at the time of the shooting. McGee said that, on the evening of May 20, 2006, defendant knocked on the window of his house. Defendant had a bloodstained, white T-shirt wrapped around his head. McGee let defendant into his bathroom and gave defendant a washcloth. When defendant removed the T-shirt from around his head, McGee saw that defendant had "a big knot and a scar" on his head. Defendant told McGee that he had been shot and that he had "left some people around the corner on the ground." McGee could hear sirens outside while defendant was in his house. Later, defendant told McGee that the wound on his head was not a gunshot; he said that he had bumped his head on a pole while climbing over a fence.

¶ 17    Leonard Stocker, a forensic investigator, was assigned to process the scene of the shooting. When Stocker arrived, Chris's body was lying near 6801 South Prairie Avenue, which was west of 308-310 East 68th Street, near the intersection of 68th Street and Prairie Avenue. Stocker found five .380 cartridge cases lying on the sidewalk near Chris's body. He found a .380-caliber handgun underneath a car parked in the street. He also recovered a

9-millimeter Glock handgun from the parkway grass near Chris's body. Stocker found two .45-caliber cartridge cases and three 9-millimeter cartridge cases on the sidewalk just east of the doorway of 308-310 East 68th Street. He also found two fired bullets near that address: one on the sidewalk in front of the building and one on the second step of the building.

¶ 18    The parties stipulated to much of the physical evidence in the case. No gunshot residue was found on Benny Love's hands. DNA testing excluded defendant from the three possible profiles found on the .380-caliber handgun found at the scene, and the swabs taken from the 9-millimeter were unsuitable for testing. The fired bullets found at the scene were from a .45-caliber handgun and neither was from the two guns left at the scene. Five of the cartridge cases Stocker recovered were from the .380-caliber handgun found on the scene and three of the cartridge cases on the scene were from the 9-millimeter he recovered. The two other cartridge cases came from a .45-caliber handgun, not the two guns that were recovered. An autopsy revealed that Chris had died from six gunshot wounds. Ballistics testing could not connect any of the bullets recovered from Chris's body to either the 9-millimeter or the .380 found at the scene. Chris's wounds exhibited no evidence of close-range firing. A bullet surgically removed from Shawn could not be matched to any of the guns that Stocker recovered.

¶ 19    Linda Willis, Shawn's mother, testified that Shawn survived the bullet wound to his face, but he is quadriplegic. The parties stipulated that Michelle Webb, Webb's mother, would testify that he had been shot in the head on May 20, 2006 and that he suffers from a traumatic brain injury that prevents him from speaking in full sentences.

¶ 20    Officer Armando Garza of the Chicago police department testified that, on October 29, 2007, defendant approached him at 8700 South State Street. Defendant told Garza that he wanted to turn himself in, that he was "tired of running," and that he had a "first degree murder" charge pending against him.

¶ 21    Detective Brian Forberg interviewed defendant after he turned himself in. The State published defendant's videotaped interrogation at trial. During his interrogation, defendant said that he was at the entrance of the apartment building that night with Love. Love and a "light-skinned" person whom defendant called "Chris" had gotten into a fight, and defendant attempted to break it up. Then "Chris" and another person put their hands under their shirts and followed defendant and Love to the alley. Defendant said that Giovanni Cunningham passed him a gun which he used to shoot "Chris." Defendant also said that he shot a "dark, skinny gun" on the same side of the apartment building as "Chris." Defendant then dropped the gun and fled. When shown photographs of the victims, defendant expressed confusion over their names. He said that he did not recognize Shawn's name. Defendant denied shooting anyone seven times. Eventually, defendant told the police that he was "through talking."

¶ 22    Defendant testified on his own behalf at trial. He said that he was hanging out with Love outside the building at 308-310 East 68th Street on May 20, 2006. Defendant explained that a person who he thought was named "Chris" approached him and Love. Defendant said he later learned that this person was not Chris, he was Shawn. Defendant testified that Shawn and Love got into a fight and that defendant pushed Love away to break it up. Defendant then went to urinate in the alley next to 308-310 East 68th Street, when he heard someone behind him. Defendant turned and saw Shawn, who was holding his hands behind his back. Another man then appeared at the entrance of the alley and put his hand under his shirt. This

unidentified man then backed up to a car, opened the trunk, and pulled out a gun. Defendant said that gunshots went off in another location, distracting Shawn and the man with the gun. Defendant grabbed the gun out of the man's hand and shot Shawn. He then fired two shots at the unknown man, dropped the gun, and ran. Defendant denied chasing Chris and shooting him. He also denied telling the police that Giovanni Cunningham had given him a gun.

¶ 23 The trial court found that Garland was credible. The court found that defendant was not credible, noting that the statements he made during his interrogation differed from his in-court testimony. The court also noted that defendant's explanation of events did "not make sense" because defendant said that he shot Shawn first even though the other person with Shawn allegedly had a gun. The court made the following findings of fact regarding each of the victims:

> "Defendant shot Roger Garland multiple times. Defendant shot [Shawn] Willis in the face. Defendant was at least one shooter of [Chris] Willis. Defendant either shot Maurice Webb or is one of the persons responsible for the gunshots to Webb, as defendant initiated the shooting spree that devastated the neighborhood.
>
> Defendant is legally responsible for all the carnage he started. Defendant acted not in self defense, but on a perceived disrespect or for whatever reasons he had."

¶ 24 The court found defendant guilty of the first-degree murder of Chris, the attempted first-degree murder of Shawn, the attempted first-degree murder of Garland, and the attempted first-degree murder of Webb. With respect to the charges relating to Chris, Shawn, and Garland, the trial court found that defendant had personally discharged a firearm that proximately caused their death or injury. With regard to the attempted first-degree murder of Webb, the trial court did not make a similar finding. Defendant appeals.

## II. ANALYSIS

### A. Sufficiency of the Evidence of the Attempted Murder of Webb

¶ 27 Defendant first challenges the sufficiency of the evidence supporting his conviction for the attempted first-degree murder of Maurice Webb. Defendant contends that the trial court found that defendant was guilty of that offense on the basis of accountability, but that there was no evidence to support that finding because there was no evidence proving who shot Webb. The State argues that, even if defendant did not shoot Webb, he was accountable for that offense because it resulted from defendant and his accomplices' acts in furtherance of their plan to shoot Shawn.

¶ 28 The parties agree that, in finding defendant guilty of the attempted first-degree murder of Webb, the trial court found that defendant was liable for Webb's shooting as an accomplice. We agree with that characterization. Again, in rendering its verdict of guilty as to the attempted murder of Webb, the trial court said that "[d]efendant either shot Maurice Webb or is one of the persons responsible for the gunshots to Webb, as defendant initiated the shooting spree that devastated the neighborhood. Defendant is legally responsible for all the carnage he started." Saying that defendant "either" shot Webb or is legally accountable for Webb's shooting cannot be read as a finding, beyond a reasonable doubt, that defendant shot Webb himself. The additional fact that the trial court did *not* find that defendant personally discharged the firearm that led to Webb's serious bodily injury only bolsters that conclusion.

- 6 -

Thus, our inquiry is limited to whether defendant was properly found guilty of the attempted murder of Webb based on an accountability theory.

¶ 29  A person is legally responsible for the criminal conduct of another, *i.e.*, is an accomplice, if he or she, "[e]ither before or during the commission of [the] offense, and with the intent to promote or facilitate such commission, *** solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2006). In this case, defendant only contests the intent element.

¶ 30  In order to prove that a defendant possessed the intent to promote or facilitate the crime, the State must prove either that the defendant shared the criminal intent of the principal, or that a common criminal design existed between the principal and the defendant. *People v. Fernandez*, 2014 IL 115527, ¶ 13. Where a common criminal design exists, any acts performed in furtherance of that design committed by one party are considered to be the acts of all parties to the design or agreement, and all parties are responsible for the consequences of those acts. *Id.* Where a defendant attaches himself to a group bent on illegal activity and knows of its criminal design, we may infer that the defendant shared the common purpose of the group. *Id.* In reviewing the sufficiency of the State's evidence of defendant's accountability, we must view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *Id.*

¶ 31  In this case, the State concedes that it did not prove that defendant shared the intent of the individual who shot Webb. Instead, the State argues that defendant was liable because it proved that he had a common design with the other shooters–to avenge the death of codefendant Giovanni Cunningham's father by killing Shawn. The State claims that the shooting of Webb was performed in furtherance of that end, regardless of whether Webb's shooting may have been accidental.

¶ 32  The State further concedes that it did not present any direct evidence of who shot Webb. But the State contends that "[i]t does not matter under the law[ ] who actually shot Maurice Webb, because defendant attached himself to a group bent on illegal activities and Webb got shot as a result." The State's position is in accord with the verdict and reasoning rendered by the trial court with regard to the attempted murder of Webb, finding defendant guilty of attempting to murder Webb because "defendant initiated the shooting spree that devastated the neighborhood. Defendant is legally responsible for all the carnage he started."

¶ 33  That reasoning is not an accurate summary of the law of accountability. It is not enough that defendant initiated the shooting spree and set into motion a chain of events that resulted in Webb being shot. Instead, in order for defendant to be accountable for Webb's shooting, the State was required to prove that Webb was shot in furtherance of the common criminal design which defendant shared with his accomplices. In other words, while the State did not need to prove *which* accomplice shot Webb, it had to prove that *an* accomplice shot Webb.

¶ 34  This principle of accomplice liability is embodied in several cases. In *People v. Cooper*, 194 Ill. 2d 419, 426-27 (2000), the Illinois Supreme Court found that the defendants could not be held accountable for murder where the evidence showed that the victim was likely shot by members of a rival gang returning gunfire initiated by the defendants. The evidence showed that the murder occurred during a shootout between two gangs: the Gangster Disciples and the Black Disciples. *Id.* at 422. The defendants were members of the Gangster Disciples; the victim, also a Gangster Disciple, was killed by return gunfire from the rival

- 7 -

Black Disciples. *Id.* At the close of the defendants' bench trial, the court found that the defendants were accountable for the victim's death even though they did not shoot him, as it was " 'foreseeable' " that the victim might be killed by return gunfire from the Black Disciples. *Id.*

¶ 35 The supreme court reversed the defendants' murder convictions, holding that the defendants could not be held accountable for a death that was caused by a rival gang member returning fire in self-defense. *Id.* at 427. The court found that, while those facts may have supported convictions under a felony-murder theory, the defendants could not be held liable under an accountability theory. *Id.* The court cited with approval this passage from the appellate court's unpublished order:

> " 'The trial judge's comments indicate he believed [the victim's] death was a reasonably foreseeable result of defendants' actions. Nevertheless, the concept of reasonable foreseeability (*i.e.* proximate cause), while essential to a felony murder inquiry, has no place in accountability analysis ***.' " *Id.* at 426-27 (quoting *People v. Cooper*, Nos. 1-95-3211, 1-95-3212 cons. (1998) (unpublished order under Supreme Court Rule 23)).

¶ 36 Thus, the defendants in *Cooper* could not be held accountable for murder simply because they initiated the exchange of gunfire, even though it was reasonably foreseeable that death might result from the shooting spree they initiated. Rather, the defendants could be liable for murder under an accountability theory only if one of their accomplices committed the murder.[1]

¶ 37 Similarly, in *Fagan v. Washington*, 942 F.2d 1155, 1158-59 (7th Cir. 1991), the Seventh Circuit Court of Appeals, interpreting Illinois accountability law, found that the defendant could not be held accountable for the murder of a victim who was shot with a gun that was not fired by the defendant or his only other armed accomplice. The defendant and his accomplice, a man named "Dede," were members of a group of 6 to 13 Black Gangster Disciples who sought revenge against a rival gang called the Vice Lords. *Id.* at 1156. The State's evidence showed that only the defendant and Dede were armed with a rifle and a shotgun, respectively. *Id.* It also showed that the defendant and Dede, standing as far as 45 feet from the group of Vice Lords, fired several shots, then ran away. *Id.* But the physical evidence proved that the victim had been shot with a .38-caliber pistol that was placed against his back. *Id.*

¶ 38 The Seventh Circuit reversed the defendant's conviction because "[n]o evidence was presented that [defendant] shared a common design with whoever shot" the victim. *Id.* at 1159. The court noted that the evidence proved that neither the defendant nor Dede shot the

---

[1]We recognize that the central issue in *Cooper* was the defendants' liability under a different provision of the accountability statute (720 ILCS 5/5-2(a) (West 1994)) than the provision at issue in this case (720 ILCS 5/5-2(c) (West 2006)). See *Cooper*, 194 Ill. 2d at 425-26 (discussing the State's argument that the defendants were accountable under section 5-2(a)). However, that was because the State conceded, after the appellate court so held, that the defendants could not be accountable under section 5-2(c). *Id.* at 423-24. Moreover, the supreme court expressly agreed with the appellate court's reasoning that defendants could not be held liable under the same provision at issue here–section 5-2(c)–and adopted that same reasoning when discussing section 5-2(a). *Id.* at 424, 426-27. The court also stated that the defendants could not be held liable "under either section 5-2(a) or (c)." *Id.* at 427. Therefore, we find *Cooper* clearly applicable to this case.

victim, and it did not prove that any of the other Black Gangster Disciples carried a .38-caliber pistol or shot the victim at point-blank range. *Id.* The court declined to find that the defendant was accountable simply because he "started shooting and someone got killed," noting that such a holding would expand accomplice liability to "something like strict liability" that is embodied in felony-murder rules. *Id.*

¶ 39    While *Fagan* was a federal case, and thus not binding on us, we find its rationale persuasive in light of *Cooper*. Moreover, this court has previously embraced *Fagan*'s discussion of Illinois's accountability principles. See, *e.g.*, *People v. Garrett*, 401 Ill. App. 3d 238, 247-48 (2010); *People v. Chirchirillo*, 393 Ill. App. 3d 916, 923-24 (2009).

¶ 40    Finally, in *People v. Cowart*, 2015 IL App (1st) 113085, ¶¶ 32-37, we recently held that the State could not establish the defendant's accountability for a shooting where there were multiple shooters, but the State did not prove that the fatal shot was made by one of the defendant's accomplices. There, the evidence showed that the victim was shot at a party where numerous patrons were armed, and witnesses testified to hearing many gunshots. *Id.* ¶¶ 3-7, 9-10. The State's evidence showed that the defendant shot at people at the party, but not the victim. *Id.* ¶¶ 5-6, 35. But the defendant was convicted of the victim's murder on an accountability theory. *Id.* ¶ 1. We stressed that the State was required to prove "that [the victim's] unidentified shooter shared in the defendant's alleged criminal design." *Id.* ¶ 37. We held that, even assuming that other shooters at the party shared a common design with the defendant, the State's evidence failed to prove that any of the participants in that common design "was the shooter who killed" the victim. *Id.* ¶ 36.

¶ 41    *Cowart* reaffirms the principles outlined in *Cooper* and *Fagan*: while the State does not need to prove the shooter's identity in an accountability case, the State must prove that the shooter was among the group of individuals with whom the defendant shared a common criminal design. If the shooter cannot be narrowed down to one of the accomplices, the defendant cannot be found guilty of murder under an accountability theory. See *id*. ¶ 37 (reversing murder conviction based on accountability where "the State has not established a factual link between the bullet that killed [the victim] and any shooter in general, let alone any shooter sharing an alleged common criminal design with the defendant").

¶ 42    The State cites *People v. Bell*, 96 Ill. App. 3d 857 (1981), for the principle that it does not "matter that it is unknown exactly who actually fired the shots that struck and injured Webb." But *Bell* does not diminish the State's burden of proving that the acts were committed by someone who shared a common criminal design with the defendant. In *Bell*, the State's evidence showed that defendant was among a group of people who planned to beat up the victim. *Id.* at 860. The defendant and others abducted the victim, transported him to a house, beat him, and strangled him. *Id.* at 861. The police found the victim's body in the house, and an autopsy revealed that the victim had died from one of three gunshot wounds to his body. *Id.* at 862.

¶ 43    The court held that the circumstantial evidence was sufficient to convict the defendant as an accomplice even though there was no evidence as to which individual, precisely, fired the fatal shot, but that was because the universe of possible suspects was limited to the group of accomplices that severely beat and strangled the victim shortly before he died; there was no evidence that anyone else had entered the house. *Id.* at 865. In addition, the medical examiner at trial had testified that the beating alone, even absent a subsequent gunshot, would have been sufficient to cause death. *Id.* Thus, in *Bell*, the court held that the State's evidence was

sufficient to establish that someone who shared the defendant's criminal design (*i.e.*, someone who beat the victim) committed the murder. The court did *not* say that it was *irrelevant* who killed the victim.

¶ 44    The State also cites *People v. Fernandez*, 2014 IL 115527, for the proposition that defendant was accountable "because [he] attached himself to a group bent on illegal activities and Webb got shot as a result." The State misconstrues the holding of *Fernandez*. The main point of contention in *Fernandez* was whether the defendant could be liable for his codefendant's act of firing a gun at a police officer where there was no evidence that the defendant knew that the codefendant was armed. *Id.* ¶ 12. The Illinois Supreme Court held that, because the defendant's accomplice shot at the officer while performing the burglary that he and the defendant had planned together, defendant was accountable for his accomplice's act. *Id.* ¶ 17. However, in *Fernandez*, the evidence unequivocally showed that the defendant's accomplice shot at the officer. *Id.* That point renders this case distinguishable from *Fernandez*. The issue in this case is not whether defendant knew that his accomplices were armed; the issue is whether the State proved that one of defendant's accomplices shot Webb in furtherance of their common criminal design. *Fernandez* does not support the State's assertion that the shooter's identity was wholly irrelevant.

¶ 45    Our discussion of the above cases shows that accomplice liability cannot lie unless there is evidence that someone with whom defendant shared a common criminal design committed the act for which defendant is being held accountable. While the felony-murder doctrine may render defendant liable for *any* death that proximately results from events he initiated, the accountability doctrine does not. See also *People v. Dennis*, 181 Ill. 2d 87, 105 (1998) (noting that "[f]elony murder and accountability have theoretically different underpinnings" and the law seeks "the broadest bounds for the attachment of criminal liability" in felony-murder cases, but not in accountability cases). Thus, it was incorrect to convict defendant for the shooting of Webb merely because defendant "initiated the shooting spree," and the State is incorrect that the identity of Webb's shooter is irrelevant. While it was not necessary to specifically identify the individual who shot Webb, it was absolutely required that the State prove, beyond a reasonable doubt, that the person who shot Webb was one of defendant's accomplices.

¶ 46    The State failed to meet that burden in this case. The State did not prove that Webb was shot by someone with whom defendant shared a common criminal design. There was no testimony whatsoever as to who shot Webb. In fact, the only evidence even placing Webb among the victims was Officer Ruhnke's testimony that he saw four victims at the scene, and Webb's mother's stipulated testimony that he had been shot in the head on May 20, 2006. Beyond those two references, we are at pains to even find another mention of Webb anywhere during the trial; defendant claims that Webb's name was never otherwise mentioned.[2]

---

[2]There was some evidence that the individual known as "Fella" was Webb, as Davis's statement referred to him as such. But Chiestder's statement expressly said that she had known Chris for years and that *his* nickname was "Fella." The trial court did not make an express finding of fact as to Fella's identity. We need not resolve this confusion, because even if the references to "Fella" were to Webb, there was still no testimony as to who shot "Fella."

¶ 47 Not one of the eyewitnesses to the shooting–Garland, Chiestder, or Davis–mentioned who shot Webb. Garland, whose testimony was specifically credited by the trial court, testified that defendant shot him, then stepped over him and shot Shawn. But then defendant fled to the west. Garland did not see defendant shoot Webb, nor did he testify that anyone else shot Webb.

¶ 48 Similarly, neither Chiestder nor Davis mentioned who shot Webb in their prior statements to the police or the grand jury. Chiestder said that she was just inside the door of the apartment building, watching defendant shoot Chris across the street. In light of her purported location, she would have been standing very close to Webb. But she said that she only saw defendant shoot Shawn and Chris; she did not say that she saw anyone shoot Webb. She heard other gunshots but did not see their source. Davis testified that he was on the stoop of the building during the shooting. He saw defendant shoot Shawn in the face but did not see anyone else get shot. He said that he later saw that "Fella" had been shot. But even assuming that Fella was Webb, Davis gave no hint as to who shot him. Thus, none of the eyewitnesses to the shooting identified anyone else as a shooter, much less as the shooter of Webb.

¶ 49 We know that three guns were fired during the incident: a 9-millimeter Glock, a .380 Kel-Tec, and a .45 handgun. The evidence thus reveals at least three shooters. One of those shooters was obviously defendant, but no eyewitness testimony reveals the identity of the other two shooters. The State obviously believes that codefendant Giovanni Cunningham was one of the shooters, but no testimony substantiated that fact. As for the third shooter, the evidence is entirely absent.

¶ 50 The 9-millimeter and the .380 were left at the scene, but the .45 was never recovered. Defendant was excluded as being a contributor to the DNA recovered from the .380. According to Davis's prior statements, Giovanni Cunningham gave defendant a 9-millimeter handgun, gave "Fella" a .357 handgun, and kept a .45-caliber pistol for himself. Davis also said that he saw the .357 lying next to Fella, not underneath the car where the .380 was recovered. Even assuming that Davis, who disclosed no basis of knowledge for his ability to identify these firearms, correctly identified the type of firearms Cunningham distributed to defendant and Fella, none of the State's evidence accounted for who was armed with the .380 handgun found at the scene. Although it was possible that Benny Love, whom Garland identified as being with defendant before the shooting, carried the .380, no one identified Love as being among the armed men that night. Moreover, according to a gunshot residue test performed shortly after Love was caught running from the scene, Love had not fired a gun. Thus, there was evidence that there was at least one person shooting at the scene who was not identified as being among defendant's possible accomplices.

¶ 51 Moreover, no fired bullets were recovered from Webb to establish which gun caused his injuries. One fired bullet was recovered from the sidewalk outside the building and one fired bullet fragment was found on the second step of the stoop of the building. Both of these fired bullets were .45-caliber bullets and were not fired from the 9-millimeter or .380 recovered from the scene. While this suggests that Cunningham may have fired shots near the entrance of the building, even viewing this evidence in the light most favorable to the State, it does not prove that Webb was hit with a .45-caliber bullet. Moreover, as we have already noted, none of the eyewitnesses testified that Cunningham (or, for that matter, anyone besides defendant) was firing a weapon that night.

¶ 52     In sum, the State's evidence proved almost nothing about Webb's shooting. While eyewitnesses testified that defendant shot Garland, Shawn, and Chris, none said that he shot Webb. No one could identify who else was shooting that night, much less who shot Webb. While some of the evidence showed that codefendant Cunningham was also armed, there was at least one other shooter whose identity the State could not establish. Even viewing the evidence in the light most favorable to the State, we cannot find that the State proved beyond a reasonable doubt that anyone with whom defendant shared a criminal design shot Webb.

¶ 53     Absent any eyewitness testimony as to who shot Webb, absent any recovered bullet from Webb that pinpointed the gun used, and given that at least one of the three shooters was never identified, we find the facts of this case quite similar to those in *Cowart*, discussed above, in that "the State has not established a factual link between the bullet that killed [the victim] and any shooter in general, let alone any shooter sharing an alleged common criminal design with the defendant." *Cowart*, 2015 IL App (1st) 113085, ¶ 37. We reverse defendant's conviction for the attempted first-degree murder of Webb.

¶ 54                B. Sufficiency of the Evidence of the Murder of Chris

¶ 55     Defendant also contends that the State presented insufficient evidence to support his conviction for the first-degree murder of Chris. Defendant argues that the only evidence to support his conviction for that offense came from Tawanda Chiestder's and Frederick Davis's prior statements to the police and grand jury, and that those accounts were not credible because they recanted them before trial, and the other evidence at trial contradicted them. The State urges us to affirm defendant's murder conviction because both Chiestder and Davis identified defendant as the person who shot Chris, and we should not engage in credibility determinations that the trial court was better suited to undertake.

¶ 56     When reviewing the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that the State proved the necessary elements of the offense beyond a reasonable doubt. *Fernandez*, 2014 IL 115527, ¶ 13. We may not substitute our judgment for the trier of fact's regarding the weight of the evidence or the credibility of the witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). We will not reverse a conviction simply because the evidence is contradictory or because the defendant claims that the witnesses were not credible. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). The State's evidence may be sufficient even where it consists entirely of the prior, recanted statements of eyewitnesses. See, *e.g.*, *People v. Griham*, 399 Ill. App. 3d 1169, 1170-71 (2010); *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999).

¶ 57     In this case, the trial court found that defendant shot Chris. This conclusion was supported by the prior statements of Chiestder and Davis, who both said that they witnessed defendant standing over Chris, shooting him multiple times. While Chiestder and Davis recanted those statements at trial, and those statements conflict with each other and other evidence, we may not reweigh the evidence. The trial court, as the trier of fact in this case, had an opportunity to review all of the evidence, along with its inconsistencies. We may not second-guess the trial court's reliance on Chiestder's and Davis's prior statements.

¶ 58     Moreover, Garland's testimony, which the trial court expressly found to be credible, corroborates the trial court's finding that defendant shot Chris. Garland testified that, after defendant shot him and Shawn, defendant ran west, the direction in which Garland then

heard additional gunfire. This supports Chiestder's and Davis's assertions that defendant shot Shawn, then chased Chris west toward Prairie Avenue. This also comports with the police testimony that Chris's body was found at the corner of 68th Street and Prairie Avenue, west of the apartment building where Garland and Shawn were shot.

¶ 59    Defendant notes that Chiestder's and Davis's prior statements conflict with Garland's account because they both said that Shawn was the first person defendant shot, whereas Garland testified that defendant shot him first. While this is a significant contradiction undermining the strength of the State's evidence, it was the trial court's prerogative to assess the credibility of these witnesses and to weigh the evidence. See *Siguenza-Brito*, 235 Ill. 2d at 228 ("[I]n a bench trial, it is for the trial judge *** to resolve any conflicts in the evidence."). We may not second-guess the trial court's judgment as to these matters. *Jackson*, 232 Ill. 2d at 280-81. Viewing this evidence in the light most favorable to the State, it was sufficient to prove that defendant shot Chris.

¶ 60    Defendant cites *People v. Brown*, 303 Ill. App. 3d 949 (1999), for the proposition that Chiestder's and Davis's statements were insufficient evidence to prove that he killed Chris. However, in *Brown*, "the *only* evidence" tying the defendant to the offense was a single, disavowed statement of an eyewitness. (Emphasis added.) *Id.* at 965. Moreover, the witness in that case waited two years to come forward with the allegedly incriminating information and testified that he only gave the police that information because they threatened to charge him with a drug offense. *Id.* Here, Chiestder's and Davis's statements were not uncorroborated. They corroborated each other and, as explained above, aligned with portions of Garland's testimony. They were also corroborated by the location of Chris's body. Unlike *Brown*, there was no substantial time gap between the incident and Chiestder and Davis giving their statements–Chiestder gave her statement less than two months after the shooting and Davis gave his less than one month after that. Likewise, Chiestder and Davis gave no reason why they lied in their prior statements like the witness in *Brown*. To the contrary, Chiestder provided a reason why she would lie in defendant's *favor*: she said that she initially accused someone other than defendant because a person name "Outlaw" threatened to kill her if she did not. Therefore, we find that the evidence in *Brown* is distinguishable from the evidence in this case.

¶ 61    Based on the evidence the trial court heard, it could have rationally concluded, beyond a reasonable doubt, that defendant shot Chris. While the State's evidence certainly included inconsistencies and contradictions, the trial court had the opportunity to consider those deficiencies in the State's evidence along with the other evidence in the case. We cannot reverse the trial court's judgment simply because the State's evidence was conflicting. We affirm defendant's conviction for the first-degree murder of Chris.

¶ 62                                    C. Presentence Credit

¶ 63    Finally, defendant asks us to correct his mittimus to reflect an additional 39 days he spent in custody prior to his sentencing. The State concedes that defendant is entitled to this credit.

¶ 64    Defendant is entitled to credit for each day he spent in custody prior to his sentencing. 730 ILCS 5/5-4.5-100(b) (West 2012); *People v. Hill*, 2014 IL App (3d) 120472, ¶ 26. Defendant was arrested on October 29, 2007 and sentenced on November 15, 2012. Defendant thus accrued 1,844 days of credit against his sentence. But his mittimus only reflects 1,805 days of credit. We direct the trial court to correct the mittimus to reflect 1,844

days' credit.

¶ 65                                    III. CONCLUSION

¶ 66        For the reasons stated above, we reverse defendant's conviction for the attempted first-degree murder of Maurice Webb. The State failed to present any evidence to support a conclusion that one of the individuals with whom defendant shared a common criminal design shot Webb. However, we conclude that the State presented sufficient evidence to convict defendant of the first-degree murder of Chris Willis. As the trier of fact, the trial court resolved any contradictions in the State's evidence regarding Chris's death and concluded that defendant shot him. Finally, we direct the circuit court to amend defendant's mittimus to reflect 1,844 days of presentence custody.

¶ 67        Reversed in part, affirmed in part; mittimus corrected.