2020 IL App (4th) 170036

NO. 4-17-0036

FILED
July 9, 2020
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| QUINCEY JULIUS JACKSON, | ) | No. 15CM1930 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Lee Ann S. Hill, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1        In November 2016, following a bench trial, the trial court found defendant, Quincey Julius Jackson, guilty of unlawful use of a weapon (UUW) (720 ILCS 5/24-1(a)(10) (West 2014)) based on an accountability theory. See *id.* § 5-2(c). In December 2016, the court sentenced defendant to 18 months of conditional discharge, 100 hours of community service, and 180 days in jail, with defendant to serve 14 days immediately and the remainder stayed until a remission hearing.

¶ 2        Defendant appeals, arguing the State failed to prove beyond a reasonable doubt that he was legally accountable for his codefendant's conduct. Specifically, defendant contends that the State failed to prove either (1) that defendant intended to promote or facilitate his codefendant's criminal conduct or (2) that defendant engaged in a common criminal design with his codefendant. We disagree and affirm.

¶ 3                                 I. BACKGROUND

¶ 4                                 A. The Charges

¶ 5        In November 2015, the State charged defendant with UUW. *Id.* § 24-1(a)(10). The

State alleged that defendant, "or one [for] who's conduct he is legally responsible, knowingly

carried on or about his person upon *** a public way *** a .38 caliber pistol."

¶ 6                                 B. The Bench Trial

¶ 7        In November 2016, the trial court conducted a bench trial. We note that, on appeal,

defendant filed a motion explaining that a transcript of the trial proceedings did not exist and a

bystander's report could not be obtained because defendant's trial counsel had moved out of the

state. Defendant was also unable to get the State to agree to a joint statement of facts. However,

the trial court, at a posttrial hearing, stated its detailed recollection of the facts at trial. Defendant

has requested this court to designate the trial court's recitation of the facts as a bystander's report

of defendant's trial pursuant to Illinois Supreme Court Rule 323(c) (eff. July 1, 2017). Because the

State did not object, we granted defendant's request. Accordingly, the following facts are from the

trial court's summation at the posttrial hearing.

¶ 8                                 1. *The State's Case*

¶ 9        Emmanuel Hernandez, a detective with the Bloomington Police Department,

testified that on November 16, 2015, he and some fellow officers were in an unmarked, undercover

van when they saw defendant and Channing Biles, the codefendant, walking on Washington Street.

Hernandez noticed Biles because he was wearing blue latex gloves. The unmarked van was parked

in the "Plasma Center [parking lot], which was about a block or two from where the initial sighting

was."

¶ 10       Hernandez testified that defendant and Biles walked into that parking lot and got

behind the unmarked van, apparently not realizing it was an undercover police vehicle. The trial court summarized the testimony as follows:

> "[Defendant and Biles are] getting behind the van; they're walking out, they're looking—I have very detailed notes—they are looking towards the school. They're going back and forth, looking at the school, and the officer noted that he could see something sticking out of Mr. Biles' pocket, but he could not determine from that view exactly what that was. He says he then sees them walk towards Lee Street, which was closer to the school, and sees them looking across to the school, across the street. That's at Washington and Lee, where the alternative school is. At that point, [the police are] getting concerned because it looks like they're—we have latex gloves on Mr. Biles, we have what appears to be observation of the school and furtive movements of moving back and forth around the undercover van, so they call for uniform officers."

¶ 11        Hernandez testified that when the uniformed officers arrived, Biles "sees them and takes off," at which point Hernandez sees a handgun in Biles's hand. Hernandez stated he did not see the handgun when defendant and Biles were near the van, but he did see something "that led him to believe there might be a handgun." Hernandez testified that defendant and Biles were hanging around the unmarked van for about 10 minutes.

¶ 12        Detective Bradley Massey of the Bloomington Police Department testified that he was one of the officers who responded to the call about a possible handgun. When Massey arrived, he saw defendant and Biles talking together and then saw Biles run eastbound on Washington Street. Massey gave chase in his vehicle. The trial court stated as follows:

> "And it's true, [defendant] did stay on the scene. He did not flee from the scene; he

stayed there. He eventually was told by an officer to stay, but for a while there, he was just there of his own volition. They eventually are able to run down Mr. Biles to find the handgun."

¶ 13 Bloomington Police Officer Justin Shively testified consistently with Massey regarding defendant's actions when police arrived. Shively took defendant into custody, searched him, and found a black ski mask.

¶ 14 Detective Steve Moreland testified that he interviewed defendant. The trial court summarized that interview as follows:

"Detective Moreland is the one [who] ends up interviewing [defendant], and he interviews him in two separate interviews. The first interview he stated he didn't know at first that it was a real gun, that he thought it was a pellet gun, and that when all this started going down and he tells him to step off, Channing Biles tells him then, 'It's real, man,' and then he takes off."

¶ 15 During the second interview Moreland conducted, defendant "said he knew it was a handgun and that he knew it had been used in a drive-by shooting, and he knew it was directed at Scotty Allen." The State then rested.

¶ 16                                    2. *Defendant's Case*

¶ 17 According to the trial court, defendant testified in his own defense as follows: "[Defendant], when he testified, admitted that he had the face mask—or the ski mask. Additionally, he admits that he sees Mr. Biles put on these latex gloves, and he says he puts on the latex gloves, I believe, when he testifies, on the walk towards—back towards the school.

* * *

Additionally, he testified that he knew that Scott Allen was at the alternative school, that he was going to be there on that afternoon. He was at the alternative school earlier, and he said he was going back because his younger brother had been at the [a]lternative school. And I'm talking about [defendant]."

¶ 18 Defendant did not present any further evidence, and the trial court found him guilty of UUW.

¶ 19 C. Posttrial Proceedings

¶ 20 Later in November 2016, defendant filed a posttrial motion in which he argued that the State failed to prove him guilty beyond a reasonable doubt. In that motion, defendant noted that (1) the State did not present any evidence that defendant possessed the gun and (2) the testimony demonstrated that defendant told Biles to "step off" while being surveilled. The motion explained what defendant told Biles: "in layman's terms; this means 'go home.' "

¶ 21 In December 2016, the trial court conducted a hearing on defendant's posttrial motion. After hearing arguments, the court summarized its recollection of the testimony at trial and then addressed the merits of defendant's claims, as follows:

"The totality of the circumstances here, [defendant] never had [the gun] in his actual possession. As I said, it's an accountability argument. And in the accountability statute, yes, it says mere presence at the scene of a crime does not render a person accountable for the offense, but a person's presence at the scene, however, may be considered with other circumstances by the [t]rier of [f]act when determining the accountability. And the other circumstances are the presence of the latex gloves, the presence of this ski mask, the furtive movements behind the van, the being in that area for ten minutes going back and forth watching the school; the

fact that they were later interviewed by Detective Moreland and given two different stories, the second of which says he knew Channing Biles had a real handgun and that he had that prior to this incident because that drive-by was before the incident at the school. So, he knew Channing Biles had a handgun; he knew who it came from; and he knew who it was to be used against at the school. The totality of the circumstances in this case are what caused the Court to find that he was guilty through accountability, and the defendant's motion is denied."

¶ 22    The trial court then conducted a sentencing hearing and imposed the sentences previously mentioned.

¶ 23    This appeal followed.

¶ 24                II. ANALYSIS

¶ 25    Defendant appeals, arguing that the State failed to prove beyond a reasonable doubt that he was legally accountable for his codefendant's conduct. Specifically, defendant contends that the State failed to prove either (1) that defendant intended to promote or facilitate his codefendant's criminal conduct or (2) that defendant engaged in a common criminal design with his codefendant. We disagree and affirm.

¶ 26            A. The Standard of Review

¶ 27    The parties disagree about the applicable standard of review. Because defendant contends he is not challenging any facts, he claims that whether the undisputed facts are sufficient to prove him guilty beyond a reasonable doubt calls for *de novo* review. See *People v. Brace*, 2017 IL App (4th) 150388, ¶ 11, 79 N.E.3d 765. The State contends that defendant is, in fact, challenging the inferences made by the trial court, and therefore, deference is owed to the fact finder. See *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 32, 130 N.E.3d 432 (noting that

*de novo* review is not appropriate where "the parties disagree about the inferences that can be drawn from the trial evidence"); *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 25, 102 N.E.3d 260 (stating the same). Defendant's argument is entirely without merit, and we emphatically reject it.

¶ 28    Defendant's argument is illogical. If he were not contesting the facts, then he could have stipulated to whatever evidence the State sought to present. This court has seen cases in which a defendant is truly not contesting the State's evidence and, instead, is simply arguing that the stipulated evidence is not sufficient to prove him guilty beyond a reasonable doubt. See *People v. Norris*, 399 Ill. App. 3d 525, 530, 929 N.E.2d 1149, 1154 (2010).

¶ 29    Of course, this is not really defendant's position. He is clearly contesting the inferences the trial court drew from the evidence it heard, and he is asking this court to not accept the trial court's findings and inferences. His request for *de novo* review is at best disingenuous.

¶ 30    It is hard to envision how *de novo* review could ever apply when, as here, the trial court has received testimony from live witnesses. Even when the parties have stipulated to the facts, "[i]f the evidence presented is 'capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution.' " *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 35, 955 N.E.2d 1244 (quoting *People v. McDonald*, 168 Ill. 2d 420, 447, 660 N.E.2d 832, 843 (1995)).

¶ 31    In fact, defendant in this appeal is challenging at least some of the facts. In his briefs, defendant argues that he was aware that the gun was real only when Biles so informed defendant just before Biles ran off. However, the trial court found defendant's second statement to Moreland—namely, that defendant always knew the gun was real—was the more credible evidence on this point.

¶ 32    Even when defendant accepts the trial court's finding regarding his knowledge of

the handgun, he still argues that other inferences made by the court are incorrect or inherently suspect. For instance, defendant disputes the trial court's observation that his having a ski mask suggests he was a part of the criminal activity. Defendant claims he had the mask simply because November is a cold month. However, we view defendant's possession of the ski mask as an example of an inference a trier of fact is permitted—and often required—to draw.

¶ 33　　　　The Illinois Supreme Court recently restated the principle that "[w]hen a court reviews a challenge to the sufficiency of the evidence, the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The court further wrote that "[t]he *Jackson* standard applies *in all criminal cases*, regardless of the nature of the evidence." (Emphasis added.) *Id.*; see also *People v. Jackson*, 2020 IL 124112, ¶ 64 ("This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial."). "This standard of review gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and *to draw reasonable inferences from basic facts to ultimate facts*." (Emphasis added and internal quotation marks omitted.) *McLaurin*, 2020 IL 124563, ¶ 22. We conclude that the standard of review the supreme court reiterated in *McLaurin* applies to this case.

¶ 34　　　　　　　B. The Defendant's Argument That the State Failed To Prove
　　　　　　　　　　He Was Legally Accountable

¶ 35　　　　In his opening brief, defendant argued that the State had to prove he and Biles "entered into a plan or 'common criminal design' for Biles to illegally possess the weapon." The State asserts that, by so arguing, defendant is attempting to "resurrect" the argument that the common-design rule requires proof of a shared intent, "namely, that a defendant must share the

specific intent of his accomplice in order to be held accountable for his accomplice's criminal acts." In his reply brief, defendant concedes that he was "imprecise in [his] framing of the issue" but maintains that (1) he was correct under either doctrine and (2) the State did not meet its burden of proving him guilty beyond a reasonable doubt.

¶ 36      For the reasons that follow, we reject defendant's arguments and agree with the State that they amount to an incorrect claim that the State needed to prove defendant had some type of intent or knowledge specific to a particular crime in order to be legally accountable.

¶ 37                          1. *The Statute on Legal Accountability*

¶ 38      Section 5-2(c) of the Criminal Code of 2012 (Code) (720 ILCS 5/5-2(c) (West 2014)) provides, in pertinent part, that a person is legally accountable for the conduct of another under the following circumstances:

> "When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts."

According to *People v. Fernandez*, 2014 IL 115527, ¶ 21, 6 N.E.3d 145, "it is well settled that, under the Illinois accountability statute, the State may prove a defendant's intent to promote or facilitate an offense by showing *either* (1) that the defendant shared the criminal intent of the principal, *or* (2) that there was a common criminal design." (Emphases in original.) Shared intent and common design are "two distinct accountability schemes" (*id.*)—"two separate bases upon which the State can prove legal accountability." *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 48, 14 N.E.3d 1.

¶ 39                          2. *Case Law on Common-Design Cases*

¶ 40        Just six years ago, the Illinois Supreme Court went to great pains to (1) clarify the

distinction in legal accountability cases between shared-intent and common-design cases and

(2) set out what is required to prove a defendant guilty in each. *Fernandez*, 2014 IL 115527, ¶ 21.

¶ 41        Not long thereafter, this court in *Phillips* expressed our hope that *Fernandez* had

finally "decisively kill[ed] the bogus shared-intent requirement of the common-design rule."

*Phillips*, 2014 IL App (4th) 120695, ¶ 54. As we explained in *Phillips*, "[t]he unanimous supreme

court in *Fernandez* *** made clear that shared intent is *not* an element of the common-design

rule." *Id.* ¶ 48 (citing *Fernandez*, 2014 IL 115527, ¶ 21). "Once the State proves the accused

intended to promote or facilitate *a* crime, it has established the accused's responsibility for *any*

criminal act done in furtherance of the intended crime." (Emphases in original and internal

quotation marks omitted.) *Id.* ¶ 43. In common-design cases, intent to commit any particular crime

is irrelevant. Instead, "[e]vidence that a defendant voluntarily attached himself to a group bent on

illegal acts with knowledge of its design supports an inference that he shared the common purpose

and will sustain his conviction for an offense committed by another." (Internal quotation marks

omitted.) *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 42        Despite the foregoing authority, defendants, including defendant in this case,

continue to argue that for the common-design rule to apply, the State must prove that a defendant

attached himself to a group bent on committing *some specific* offense. So, here, defendant argues

that he cannot be convicted of UUW if the group he joined did not intend to commit that specific

offense. However, as the Illinois Supreme Court has written, "this emphatically is *not* the rule in

common-design rule cases." (Emphasis in original.) *Id.* ¶ 21.

¶ 43        3. *A Defendant Need Not Intend To Commit Any Specific Crime*
                        *in a Common-Design Case*

¶ 44        As the supreme court explained in *Fernandez*, whether a defendant had the intent

to commit some specific crime is the focus in shared-intent cases, not common-design cases, like the case now before us. *Id.* Shared-intent cases have nothing to do with common-design cases because they are analytically separate. *Id.*

¶ 45        All members of the group in common-design cases who are bent on illegal acts are equally responsible for "*any acts* in the furtherance of that common design." (Emphasis added and internal quotation marks omitted.) *Id.* ¶ 13. As this court explained in *Phillips*, even if a defendant is *completely unaware* of his codefendant's true intentions, he is still legally accountable for any crimes committed by the group to which the defendant had attached himself, knowing that the group was bent on illegal acts. *Phillips*, 2014 IL App (4th) 120695, ¶ 44. Accordingly, common-design cases focus on whether a defendant was part of such a group and not on whether the defendant intended for any particular crime to occur. A defendant's "intent" to commit any specific crime is not relevant in common-design cases. Instead, "[e]vidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design *supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another*." (Emphases added and internal quotation marks omitted.) *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 46        4. *Did Defendant Join a Group With a Common Design Bent on Illegal Acts?*

¶ 47        Factors that may demonstrate whether a common design existed at all and whether a defendant joined it include, but are not limited to, the following: Did the defendant (1) aid in the planning of the common design or preparation for its commission, (2) arrive at the scene without disapproving of, disassociating from, or opposing the group, (3) maintain a close affiliation with group members after the commission, (4) flee from the scene, (5) share the proceeds of a criminal act, (6) destroy or conceal evidence, and (7) fail to report the crime? *People v. Taylor*, 164 Ill. 2d

131, 141, 646 N.E.2d 567, 571 (1995); *People v. White*, 2016 IL App (2d) 140479, ¶ 28, 59 N.E.3d 156; *People v. Turner*, 375 Ill. App. 3d 1101, 1104, 875 N.E.2d 175, 180-81 (2007). "These factors are not required for a finding of accountability and are instead used as considerations." (Internal quotation marks omitted.) *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 43, 67 N.E.3d 485.

¶ 48        In common-design cases, the State need not offer any evidence that the defendant "aided, abetted, or solicited" the offense. See *Turner*, 375 Ill. App. 3d at 1104 ("A defendant need not act affirmatively if there is a 'common criminal plan or purpose.' " (quoting *Taylor*, 164 Ill. 2d at 140-41)). "[J]ust as in a conspiracy, evidence of participation in a common criminal design is not necessarily explicit." *White*, 2016 IL App (2d) 140479, ¶ 32.

¶ 49        The relevant "intent" in common design cases is that of the group, not the defendant. A defendant may be held accountable if he attaches himself to a group "bent on illegal acts with knowledge of its design." "[W]ith knowledge of its design" means only that a person who attached himself to a group knew that the group intended to engage in criminal behavior of some kind—nothing more specific is required. See *Phillips*, 2014 IL App (4th) 120695, ¶ 44. Accordingly, all that is required for a defendant to be legally accountable in a common-design case is for the evidence to show that (1) the group was intending to engage in some form of criminal behavior and (2) the defendant was aware of the group's intentions. See *People v. Batchelor*, 171 Ill. 2d 367, 376, 665 N.E.2d 777, 780-81 (1996) ("[A] common purpose, or design, to commit a crime *** can be inferred from the circumstances surrounding the perpetration of the unlawful conduct."); *White*, 2016 IL App (2d) 140479, ¶ 32 ("[A] common design may be broadly inferred from the surrounding circumstances.").

¶ 50        Case law contains many examples of legal accountability based upon common design. For instance, in *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 31, 130 N.E.3d 28, the First

District explained how the evidence revealed a common criminal design, as follows:

> "[T]here was more than sufficient evidence that Ealy joined the convoy returning to Wentworth Gardens for the express purpose of avenging the slight to Johns and her friends. The group's common criminal design was to 'see who shot at [them]' and 'deal with the matter.' Under the circumstances, and particularly in light of what transpired, it is reasonable to infer that the group did not intend to 'deal with' the perpetrators in a peaceful or lawful manner."

¶ 51    See also *People v. Johnson*, 35 Ill. 2d 624, 626, 221 N.E.2d 662, 663 (1966) ("[D]efendant joined with a group bent upon 'getting some money' ***."); *People v. Rybka*, 16 Ill. 2d 394, 406, 158 N.E.2d 17, 23 (1959) (defendants entered car with group of boys "talking about getting a negro"); *People v. Gil*, 240 Ill. App. 3d 151, 159, 608 N.E.2d 197, 203 (1992) (four men in a car " 'planned their evening' " and decided to " 'get some Disciples' " in revenge for the beating of a friend); *People v. Reckers*, 251 Ill. App. 3d 790, 793, 623 N.E.2d 811, 814 (1993) (defendant "was aware of the criminal design" of one boy meeting up in another town to fight another boy); *People v. Rebollar-Vergara*, 2019 IL App (2d) 140871, ¶ 105, 128 N.E.3d 1059 ("common design to harm Gonzalez").

¶ 52                    5. *The Group's Common Design in This Case*

¶ 53    In this case, we conclude that the State presented more than enough evidence that the group was bent on illegal activities. In so concluding, we reiterate that a "group" is two or more people. See 720 ILCS 5/5-2(c) (West 2014); see also *Phillips*, 2014 IL App (4th) 120695, ¶ 1 (noting the "group" consisted solely of the defendant and the person who fired the shot that killed the victim). The relevant evidence is anything that tends to demonstrate—or from which one can infer—that (1) the *group* is bent on illegal acts and (2) defendant had knowledge of its design.

*Fernandez*, 2014 IL 115527, ¶ 13.

¶ 54    The evidence demonstrated that Biles had acquired a gun and was involved the previous day in a drive-by shooting with Allen as the target. Biles was on his way to the alternative school, where Allen was supposed to be. Biles had a firearm and, while walking to the school, put on blue latex gloves. This evidence was more than sufficient to show that Biles was heading towards the school with the purpose of confronting Allen, almost certainly in a violent manner. Defendant does not offer, nor can he provide, an innocent explanation for Biles's wearing latex gloves. Such gloves would serve only one purpose—keeping the wearer's hands clean—and do not provide warmth. The gloves demonstrate the seriousness and violent nature of Biles's plan. Although this evidence was sufficient, the State also showed that Biles "scouted" the school for 10 minutes while hiding behind a van.

¶ 55    *6. Defendant Voluntarily Attached Himself to a Group Bent on Illegal Acts With Knowledge of Its Design*

¶ 56    Defendant argues that the State could not prove he "intended to help Biles possess the weapon because [defendant] was only present at the scene and merely had knowledge Biles was carrying a gun." But defendant has it backwards: the State was not required to prove that defendant "intended to help Biles possess the weapon." In common-design cases, like this one, the State need not prove a defendant aided or abetted at all *in the commission of a specific crime*. Instead, the State needed to prove only that defendant shared a common criminal design with Biles, at which point defendant became legally accountable for all criminal acts committed by Biles. *Id.* In other words, defendant is not legally accountable because he helped or assisted Biles to carry the weapon; defendant is legally accountable because he voluntarily attached himself to a group— namely, Biles and himself—bent on illegal acts with knowledge of the group's criminal intentions.

¶ 57    Defendant contends that, at most, the State showed defendant was aware Biles

(1) had a handgun and (2) was planning to commit a crime. Defendant further points out that he (1) did not run from the police when they arrived, (2) did not maintain a close relationship with Biles after the crime, and (3) cooperated with the police by obeying their orders and giving two interviews. Defendant also notes that having a ski mask in November was appropriate for the weather conditions. Based upon these claims, defendant contends that the State failed to prove he was accountable for Biles's unlawful possession of a handgun. We disagree.

¶ 58 The State presented evidence that defendant knew about the drive-by shooting of Allen, that Biles had a gun, and that Allen was at the alternative school. Defendant decided to walk and accompany Biles to the school while Biles put on blue latex gloves. Given this information, a rational trier of fact could infer that (1) Biles had a plan to confront Allen, (2) the plan was serious and involved the distinct possibility of violence, (3) defendant knew of Biles's ill will toward Allen and his plan to confront him, and (4) knowing all this, defendant decided to accompany Biles and to participate in observing the school. On these facts, a rational trier of fact could have inferred that (1) Biles was going to confront Allen and commit some type of battery (at least) upon Allen and (2) defendant voluntarily joined this group—consisting of him and Biles—with knowledge that the group was bent on illegal acts. As in *Ealy*, the trier of fact could infer, based on the surrounding circumstances, that Biles did not intend to confront Allen in a peaceful or lawful manner and that defendant knew that. *Ealy*, 2019 IL App (1st) 161575, ¶ 31.

¶ 59 This case is similar to *Taylor*, 164 Ill. 2d at 142, in which the supreme court wrote the following:

> "According to Taylor's statements to the police, he was aware, prior to the actual shooting, that Kendricks wanted to kill Otha Smith, that Kendricks was armed with a weapon, and that Kendricks had instructed Page where to drive to find

- 15 -

the victim. Knowing this, Taylor voluntarily stayed with the group."

The only difference between our present case and *Taylor* is that the police stopped defendant and Biles before any additional crimes were committed.

¶ 60        Defendant also contends that "[w]ithout some showing that [defendant] knew Biles was going to shoot someone at the school and that he was carrying a weapon, the State could not prove that [defendant] was accountable for Biles' conduct." But defendant is again attempting to require the State to prove some type of shared intent with Biles. The State is required to do no such thing. Again, the only evidence needed to convict in a common design case is that a defendant voluntarily attached himself to a group bent on illegal activities with knowledge of the group's design.

¶ 61        Here, the trial court found that defendant knew "who the gun was to be used against at the school" and concluded that defendant was aware that the group's purpose was not innocent in nature. The record fully supports the court's conclusion that (1) defendant demonstrated his attachment to the group and (2) he had knowledge of the group's common criminal design.

¶ 62        7. *Was Any Criminal Act Done in Furtherance of the Common Criminal Design?*

¶ 63        Once the evidence shows that a defendant has voluntarily attached himself to a group bent on illegal activities with knowledge of its design, the only question remaining is whether the evidence shows *any* criminal act was done by *any* member of the group in furtherance of the group's common design.

¶ 64        Here, defendant concedes that Biles committed UUW by unlawfully possessing a gun on a public way. The evidence shows that defendant knew Biles had a criminal intent towards Allen, be it to batter or kill him. Because defendant voluntarily attached himself to Biles, thereby forming a group, with knowledge of the group's common design, he was legally accountable for

the actions of Biles.

¶ 65        It does not matter that defendant may not have known the precise crime that Biles intended to commit. And, indeed, as defendant and Biles were engaged in "furtive movements" around the undercover van as they watched Allen's school, Biles at that point may not have yet decided what he was going to do to Allen. None of that matters. What matters is that defendant *knew* of the group's criminal design, and he *voluntarily attached* himself to the group. Accordingly, considering the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to prove that defendant was legally accountable for Biles's commission of UUW.

¶ 66        Before concluding, we thank the trial court for providing such a detailed record of (1) the proceedings at trial and (2) its analysis when addressing defendant's posttrial motion.

¶ 67                                III. EPILOGUE

¶ 68        Although the Illinois Appellate Court has followed the supreme court's guidance on legal accountability since the *Fernandez* decision (see, *e.g.*, *People v. Williams*, 2016 IL App (1st) 133459, ¶¶ 45-48, 64 N.E.3d 1086; *People v. James*, 2017 IL App (1st) 143391, ¶¶ 56-57, 93 N.E.3d 626; *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶¶ 38-40, 81 N.E.3d 1023; *Ealy*, 2019 IL App (1st) 161575, ¶¶ 31-33; *People v. Malcolm*, 2015 IL App (1st) 133406, ¶¶ 40, 43, 39 N.E.3d 98), defendants continue to raise "the bogus shared-intent requirement of the common-design rule" (*Phillips*, 2014 IL App (4th) 120695, ¶ 54), as shown by the arguments in this case. We reiterate what we wrote in *Phillips* about such arguments:

            "The shared-intent requirement of the common-design rule is as resilient as

            it is unsound. Its ability to maintain a foothold in Illinois jurisprudence despite 160

years of rejection by the supreme court reminds us of the defunct evidentiary doctrine of *res gestae.* Justice Greiman drew the appropriate analogy:

> 'Like an entombed vampire, every now and again "Count *Res Gestae*" moves the cover of his coffin and begins to circulate in the world of litigators and judges ***. ***
>
> * * *
>
> I would hope that this concurring opinion can be the equivalent of a stake in the heart of *res gestae* and that the coffin lid may be securely fastened.' [Citation.]

Like *res gestae*, the shared-intent requirement of the common-design rule has shown an uncanny ability to come back from the dead. Even though the past 160 years of supreme court precedent have failed to decisively kill the bogus shared-intent requirement of the common-design rule, we are hopeful that *Fernandez* has finally finished the job. We hope that this opinion will serve as an additional nail in the coffin." *Id.* (quoting *People v. Rogers*, 264 Ill. App. 3d 740, 752-53, 636 N.E.2d 565, 574 (1992) (Greiman, P.J., specially concurring)).

¶ 69    As shown by the arguments in this case, our hopes have been dashed that the shared-intent requirement of the common-design rule has been killed. To quote Miracle Max from "*The Princess Bride*," it appears that the shared-intent requirement is "only mostly dead." Accordingly, in an effort to avoid a zombie apocalypse of the undead, we hope that this latest opinion of ours might be the equivalent of cutting off the head of the shared-intent requirement, riddling its body with silver bullets, stuffing its mouth with garlic, and burying it in a lead-lined coffin in hallowed ground.

## IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

**No. 4-17-0036**

| | |
|---|---|
| **Cite as:** | *People v. Jackson*, 2020 IL App (4th) 170036 |
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 15-CM-1930; the Hon. Lee Ann S. Hill, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, John M. McCarthy, Catherine K. Hart, and Jessica L. Harris, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Benjamin M. Sardinas, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |