NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180584-U

NO. 4-18-0584

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 7, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| KEIRSEAN M. BOND, | ) | No. 17CF1732 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The State's evidence was sufficient for a reasonable jury to find defendant guilty of the charged offenses beyond a reasonable doubt based on the theory of accountability.

(2) The trial court did not err in denying defendant's motion *in limine* to exclude cell phone records obtained without a search warrant.

(3) Counsel did not render ineffective assistance by failing to object to the admission of a Snapchat message, as defendant could not demonstrate prejudice.

¶ 2     In May 2018, a jury found defendant guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)), attempt (first degree murder) (*id.*), and armed robbery (*id.* § 18-2(a)(3)) based on an accountability theory from a drug transaction that ended in a shooting. The trial court sentenced defendant to 30 years' imprisonment on the first degree murder conviction to run consecutive to two 10-year concurrent terms on the attempt and armed robbery convictions. Defendant appeals on three grounds.

¶ 3        First, defendant argues the evidence is legally insufficient to sustain his convictions when the State's only evidence against him was the "incredible" testimony of one of the victims— testimony which arguably also did not establish an accountability theory of guilt. We disagree. When we consider the question of defendant's accountability for the offenses, and we view the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the crimes to be proven beyond a reasonable doubt and that defendant engaged in a common criminal design with the shooter.

¶ 4        Second, defendant contends his convictions must be reversed because the trial court erred in allowing the admission of defendant's cell phone location records without first obtaining a search warrant in violation of his fourth amendment rights (U.S. Const., amend. IV). We hold the State relied on the existence of probable cause in its application for the order to obtain defendant's cell phone records. Because the trial court, in its order, specifically found the State's request was based on probable cause, it satisfied the requirements generally relied upon for obtaining a search warrant, and the application and order were the functional equivalents thereto.

¶ 5        Third, defendant claims he was denied the effective assistance of counsel when his trial attorneys failed to object to the admission of a Snapchat message. Defendant claims the message was not properly authenticated as documentary evidence and was therefore inadmissible. We conclude the victim's testimony was sufficient to authenticate the message and the jury was entitled to rely on this authentication to determine how the crimes occurred. Thus, we find counsels' failure to object to the admissibility of the message did not constitute deficient performance when defendant was unable to demonstrate he suffered prejudice.

¶ 6        Therefore, we affirm the judgment.

¶ 7                    I. BACKGROUND

- 2 -

¶ 8        The jury trial began on May 14, 2018, and continued for four consecutive days. The following is a summary of the evidence we find relevant to the issues presented on appeal.

¶ 9                          A. The Testimony of Scottie Bone

¶ 10        Scottie Bone was one of the two victims in this case. Upon taking the witness stand, Bone acknowledged his criminal history, which included weapon and theft charges, and his pending cases, which included drug and domestic battery charges. Bone testified he met defendant in 2015 while they were both housed at Graham Correctional Center. They were then transferred to the Du Quoin Impact Incarceration Program where they were "bunkies." Bone considered defendant a friend. For the two months or so they spent together, they discussed conducting drug transactions upon release. They exchanged telephone numbers.

¶ 11        Bone said he and defendant communicated "off and on" by text or Snapchat after their release, trying to get "stuff situated" to "make a deal" (meaning they were planning a marijuana transaction). Bone testified that on November 18, 2017, he messaged defendant and told him he had five pounds of marijuana to sell him. The agreement was five pounds at $2700 per pound. Bone lived in Effingham and defendant lived in Decatur. Bone said he wanted to meet defendant in Shelbyville, where they would both be out of their "comfort zone." Instead, they agreed to meet at the Mt. Zion Walmart, but "things got complicated." Defendant told Bone he would pay $300 more per pound if Bone would meet at defendant's house in Decatur. Bone agreed.

¶ 12        Bone asked his friend Todd Feldkamp to accompany him and Feldkamp agreed. Bone drove Feldkamp's 2011 Lincoln MKZ to Decatur. They were to meet defendant at the Family Video on Water Street and then follow defendant to his house. Once Bone and Feldkamp arrived at Family Video, Bone said he called defendant. According to Bone, defendant said he was five minutes away and would be in a white car. Defendant then sent Bone a Snapchat message that said

"Lac." To Bone, the message meant defendant would be in a white Cadillac. Bone identified the white Cadillac pulling into the parking lot from a surveillance video. The car pulled into the parking lot and then Bone followed the car to a house at 1660 North Edward in Decatur.

¶ 13        Bone had put $700 in the center console of the Lincoln "just in case something would go wrong that [they] would still have money." The marijuana was vacuum sealed in a duffel bag with $5000 that Bone was going to use afterward to purchase more marijuana.

¶ 14        Bone said the Cadillac pulled into the driveway of the residence, backed out, and parked on the street directly in front of the house. Bone also parked on the street behind the Cadillac. Defendant exited the driver's side of the Cadillac and walked toward Bone and Feldkamp. Defendant greeted only Feldkamp, shook his hand, walked back to the Cadillac, and began talking to someone in the back passenger seat. Bone retrieved the duffel bag with the marijuana from the trunk. Bone said defendant was wearing a black Jordan sweatshirt and black pants. The backseat passenger, who was also wearing all black, including a hoodie pulled tight around his head, exited the Cadillac and all four individuals walked up the driveway toward the house. Bone and defendant walked side-by-side with Feldkamp and the unknown male behind them. It was very dark and difficult to see. Bone thought maybe defendant used the flashlight on his cell phone to light their path.

¶ 15        Defendant walked to the backdoor of the residence and opened the screen door. Bone would have been first to enter the house, then Feldkamp, and then the unknown male, while defendant held open the door. Bone admitted he had a knife in his pocket and thought he may have kept his hand on it, though he denied brandishing it. As they stood at the door, the unknown male pulled a gun, pointed it at Feldkamp, and told him not to move. He shot Feldkamp, who fell to the ground. He then shot Bone in the forearm. He turned back to Feldkamp and shot him again. Bone

yelled, "just take it," referring to the duffel bag. After defendant and the unknown male left the scene, Bone called the police.

¶ 16                               B. Testimony of Officer Oldham

¶ 17          Anna Oldham, a Decatur police patrol officer, testified that, at approximately 8:45 p.m. on November 18, 2017, she responded to a call at 1660 North Edward. There, she met Bone in the driveway. He was bleeding from his arm and "was frantically pacing back and forth telling [her] to help his friend, help his friend, who was in the back of the residence." She saw Feldkamp lying on his back unresponsive, so she began chest compressions. Oldham asked Bone if he knew the suspects. Bone advised one of the suspects was defendant and they had both fled in a white Cadillac.

¶ 18                               C. Testimony of Farry Jones

¶ 19          Farry Jones testified he lived at 1632 North Edward Street. At approximately 8:30 p.m. on November 18, 2017, he was sitting on his front porch smoking a cigarette when he heard four to five gunshots. He said he crawled into his house. He did not see or hear anyone. When inside the house, he looked out the window and saw "a car speeding off and that was it." Jones said he could not tell the make or model of the car; he said it "was just a dark-colored vehicle." He said it was "dark down through there" and he was watching through "black sheer curtains."

¶ 20                               D. Testimony of Teona Dandridge

¶ 21          Teona Dandridge testified that defendant is related to her two sons on their father's side. She said since 2011, she had owned the house at 1600 North Edward in Decatur where the shooting took place. The house had been vacant for approximately five years. She believed it was likely defendant knew the house was vacant.

¶ 22                               E. Testimony of Detective Borowczyk

¶ 23    Ronald Borowczyk, a Decatur police detective, testified he conducted a data extraction from Bone's cell phone. He said the last Snapchat activity between Bone and defendant occurred at 8:37 p.m. on November 18, 2017, when defendant (username "Sodabox") sent the message "Lac."

¶ 24                    F. Testimony of Lieutenant Thompson

¶ 25    Kristopher Thompson, the Macon County jail superintendent, testified that when defendant was booked into the jail on November 20, 2017, he gave his address as 306 South McClellan Street in Decatur and listed his wife, Ciara Dickens Bond, as his emergency contact.

¶ 26                    G. Testimony of Detective Dailey

¶ 27    David Dailey, a Decatur police detective, testified as an expert in the interpretation of cell phone records. When analyzing defendant's cell phone call records, he discovered a call at 8:45 p.m. on November 18, 2017, that utilized a cell site and sector in the area of the homicide scene. After that call, a "large number" of incoming calls for the next 14 hours went to voicemail, which Dailey described as "abnormal activity" for that phone based upon its historical records.

¶ 28                    H. Testimony of Detective Kuchelmeister

¶ 29    Jason Kuchelmeister, a Decatur police detective, testified he was assigned as primary detective for the case. He had recovered surveillance video from Little Caesars, which shared a parking lot with the Family Video on Water Street. The video showed the Lincoln enter the parking lot at approximately 8:30 p.m. on November 18, 2017, and park.

¶ 30    Kuchelmeister testified the investigation remained open as to the identity of the second suspect, the shooter, as he had confirmed that defendant was not the shooter. Bone had been shown six separate photo line-ups and was unable to identify the man who shot him and

Feldkamp. Kuchelmeister said he had found several text messages on Bone's phone that indicated Bone was planning other cannabis transactions in Decatur on November 18, 2017.

¶ 31    After considering the evidence presented, the arguments of counsel, and the jury instructions, the jury found defendant guilty of first degree murder, attempt (first degree murder), and armed robbery. Defendant filed a posttrial motion, which the trial court denied.

¶ 32    At sentencing, the trial court "considered the facts of this case, the factors in aggravation and mitigation, and the presentence investigation report." The court sentenced defendant to 30 years' imprisonment on his first degree murder conviction and two 10-year terms on his attempt and armed robbery convictions. The 10-year terms were ordered to run concurrently with each other but consecutively to his 30-year term.

¶ 33    This appeal followed.

¶ 34                              II. ANALYSIS

¶ 35                        A. Sufficiency of the Evidence

¶ 36    Defendant claims the State failed to prove beyond a reasonable doubt that he was legally accountable for the shooter's conduct. He claims the State failed to prove he engaged in a common criminal design with the shooter when the only evidence linking him to the crimes was Bone's testimony. He contends, because Bone's testimony was "so fraught with contradictions and inconsistencies," no rational trier of fact could have found him guilty beyond a reasonable doubt. We disagree.

¶ 37    In this case, to find defendant guilty of first degree murder, attempt (first degree murder), and armed robbery under the accountability theory, the State had to prove defendant engaged in a common criminal design with the shooter, as it is undisputed that defendant was not

the shooter. Therefore, to be held criminally responsible for the actions of the shooter, the State must have convinced the jury that defendant and the shooter shared a common criminal design.

¶ 38        When presented with a challenge to the sufficiency of the evidence, the question before the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies in all criminal cases regardless of the nature of the evidence. *Id.*; see also *People v. Jackson*, 2020 IL 124112, ¶ 64 ("This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial."). "This standard of review gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and *to draw reasonable inferences from basic facts to ultimate facts*." (Emphasis added and internal quotation marks omitted.) *McLaurin*, 2020 IL 124563, ¶ 22. "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *People v. Hardman*, 2017 IL 121453, ¶ 37. Further, the reviewing court must "not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Gray*, 2017 IL 120958, ¶ 35. "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 39        As stated, in this case, the State relied on the theory of accountability to prove defendant's guilt. Under this theory, a person is legally accountable for the conduct of another person when,

"(c) either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.

When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." 720 ILCS 5/5-2(c) (West 2016).

¶ 40   In order to prove the defendant had the intent to promote or facilitate an offense, the State must prove (1) there was a common criminal design with the principal offender or (2) the defendant shared the criminal intent of the principal offender. *People v. Fernandez*, 2014 IL 115527, ¶ 13. "In common-design rule cases, the rule is and remains that of *Kessler*, namely, that 'where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word "conduct" encompasses any criminal act done in furtherance of the planned and intended act.' " *Id.* ¶ 21 (quoting *People v. Kessler*, 57 Ill. 2d 493, 497 (1974)). That is, "[a]ll members of the group in common-design cases who are bent on illegal acts are equally responsible for '*any acts* in the furtherance of that common design.' " (Emphasis in original.) *People v. Jackson*, 2020 IL App (4th) 170036, ¶ 45 (quoting *Fernandez*, 2014 IL 115527, ¶ 13).

"Accordingly, common-design cases focus on whether a defendant was part of such a group and not on whether the defendant intended for any particular crime to occur. A defendant's 'intent' to commit any specific crime is not relevant in common-design cases. Instead, '[e]vidence that a defendant voluntarily attached

himself to a group [or individual] bent on illegal acts with knowledge of its design *supports an inference* that he shared the common purpose and *will sustain his conviction for an offense committed by another*.' " (Emphases in original.) *Jackson*, 2020 IL App (4th) 170036, ¶ 45 (quoting *Fernandez*, 2014 IL 115527, ¶ 13).

¶ 41 We note a "group" consists of two or more people. See *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 34 (the defendant's conviction of first degree murder under accountability theory upheld when the evidence showed the defendant and another individual, who fired the shot that killed the victim, shared a common design to commit a crime). Thus, the State was not required to present evidence of words of an agreement to prove a common design between defendant and the shooter, nor was it required to prove defendant actively participated in the shootings or armed robbery in order to hold him accountable. See *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). Rather, common design can be inferred from the circumstances of the crime, such as the defendant's aid in the planning, his presence during its commission, his continued close association with other offenders after its commission, his failure to report the crime, and his flight from the scene. *Jackson*, 2020 IL App (4th) 170036, ¶ 47. Thus, as this court explained in *Phillips*, even if the defendant is completely unaware of the other offender's true intentions, he remains legally accountable for any crimes committed by the other offender to whom defendant attached himself, knowing the other offender was bent on illegal acts. *Phillips*, 2014 IL App (4th) 120695, ¶ 44.

¶ 42 Again, as a reviewing court, we will not overturn a jury's verdict under the accountability theory unless the evidence, when viewed in the light most favorable to the State, is so improbable or unsatisfactory that a reasonable doubt of the defendant's accountability and, thus, of his guilt, exists. See *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. Applying this standard, we conclude the State sufficiently proved defendant guilty when the evidence supported an

inference that defendant attached himself to a group bent on illegal acts, namely the armed robbery and shootings of Feldkamp and Bone.

¶ 43        In this case, reasonable inferences from the evidence presented show the following. Defendant and Bone had discussed in 2015 arranging a sale of marijuana at a future date. Two years later, on November 18, 2017, they communicated through Snapchat about the transaction coming to fruition. As they went back and forth on a meeting place, Bone finally agreed, against his wishes, to drive to defendant's house in Decatur, as this was not a location where both were outside of their "comfort zones." It is reasonable to assume defendant offered to pay more money per pound in order to lure Bone to, what he knew to be, a vacant house in Decatur. Defendant asked Bone to meet at the Family Video and then follow him to the vacant house. Defendant told Bone over the phone he would be in a white car. He followed that conversation with a Snapchat message, saying he would be in a Cadillac, or "Lac," as the message read. Because of the nature of the Snapchat application, previous messages had disappeared and, according to Detective Borowczyk, this "Lac" message was the "last activity."

¶ 44        Defendant drove to the house, pulled into the driveway, but backed out to park on the street. Bone followed defendant's lead and parked on the street as well. Until Feldkamp exited the car, defendant may not have realized Bone had a passenger with him. It is reasonable to assume defendant greeted only Feldkamp, as he was surprised to see him with Bone. It is also reasonable to assume he went back to the Cadillac to inform the shooter, who was in the backseat, that Bone had brought someone with him. Bone had the marijuana and cash that he intended for another transaction in a duffel bag that he carried to the house. All four men walked to the backdoor of the house where it was extremely dark. Defendant acted as if he was intending to enter the house by opening the screen door while Feldkamp and Bone stood close by. The shooter pulled the gun,

shot Feldkamp twice and Bone once, grabbed the duffel bag, and fled the scene with defendant in the Cadillac.

¶ 45    Defendant claims Bone's testimony should be wholly discredited due to inconsistencies related to statements he made to police regarding (1) the amount of marijuana he intended to sell, (2) his reported physical descriptions of defendant and the shooter, (3) who it was that opened the screen door, (4) the exact order of the shots fired and who was hit when, (5) the change in plans on the meeting place, (6) whether he brandished a knife found in his pocket, (7) the contents of the duffel bag, and (8) his description of the length of defendant's hair and beard. Apparently, the jury was not affected by these inconsistencies or most likely considered them insignificant or inconsequential. After all, it is within the jury's province to determine a witness's credibility and that determination is afforded great deference on appeal. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 46    From all this, when taken in the light most favorable to the State, and considering in particular Bone's testimony as the victim, defendant's planning and coordination of the meeting, defendant's flight from the scene, and all reasonable inferences taken from the totality of the evidence presented, we find that any rational trier of fact could have found defendant guilty beyond a reasonable doubt pursuant to an accountability theory. We find the State sufficiently proved defendant and the shooter had a criminal intent as it related to this drug transaction, be it to rob at gunpoint or actually shoot Bone and/or Feldkamp. Because defendant voluntarily attached himself to the shooter, thereby forming a "group," with knowledge of the group's common design, defendant was legally accountable for the actions of the shooter. Accordingly, a reasonable jury could find defendant was legally accountable for the murder of Feldkamp, the attempted murder of Bone, and armed robbery.

- 12 -

¶ 47                                    B. Cell Phone Records

¶ 48        Defendant next contends the trial court erred in denying his motion *in limine* to exclude his cell phone location records obtained without a search warrant. Although that was not the basis for defendant's motion *in limine*, we will address defendant's argument as stated in his brief. In his motion *in limine*, he sought exclusion of the cell phone location records, not because they were obtained without a search warrant, but because they would be presented to the jury as "complicated scientific evidence" by a lay witness. In defendant's brief in this appeal, citing *Carpenter v. United States*, 138 S. Ct. 2206 (2018), he argues the historical cell phone location evidence was improperly admitted because the cell phone records were improperly obtained without a warrant.

¶ 49        In *Carpenter*, decided in June 2018 after defendant's trial in May 2018, the United States Supreme Court held that a person has a legitimate expectation of privacy in the record of his or her physical movements as captured through cell-site location information (CSLI). *Id.* at 2217. Thus, the collection of CSLI from a wireless carrier is a "search," within the meaning of the fourth amendment, and so generally requires a warrant. *Id.* at 2220-21. Therefore, law enforcement "must generally obtain a warrant supported by probable cause before acquiring such records." *Id.* at 2221.

¶ 50        Searches conducted without a warrant are *per se* unreasonable under the fourth amendment subject only to a few exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). However, in this case, although a search warrant was not obtained, the police filed an "application" seeking an order from the trial court directing the cell provider to furnish location records for defendant's cell phone. The "application" was filed pursuant to 18 U.S.C. § 2703(d) (2018) (the federal statute authorizing the collection of CSLI without a warrant or the showing of probable

cause required to obtain one). Pursuant to this federal statute, the government may obtain a disclosure order upon a showing of "specific and articulable facts" demonstrating "reasonable grounds to believe" the records are relevant and material to an ongoing criminal investigation. *Id.* However, in this case, the State went beyond the requirements of the statute and sought the provision of the records under the higher standard. The court's order granting the application specifically stated it was "based on probable cause."

¶ 51    Prior to *Carpenter*, there were no Illinois state court decisions examining the relationship between the fourth amendment and acquisition of CSLI, nor was there any specific statute requiring a warrant for the acquisition of CSLI. We have found no Illinois case law that expressly allowed or prohibited the acquisition of CSLI without a search warrant.

¶ 52    Nevertheless, we need not reach the issue of whether the exclusionary rule, which justifies the exclusion of the records from trial because they were obtained without a warrant, applies in this case. This is so because the application, according to the trial court's order, was based on probable cause. The officers sought the CSLI to locate defendant and to obtain records "relevant and material to a murder investigation."

¶ 53    The test for sufficiency of a complaint for a search warrant is whether, as a whole, it adequately establishes a fair probability that evidence of a crime will be found in a particular place. *People v. Gacy*, 103 Ill. 2d 1, 22 (1984). Defendant could be afforded no more protection had a warrant been issued. Thus, we conclude the trial court did not err by admitting the CSLI, as those records were obtained on the basis of probable cause. Indeed, at the August 2018 hearing on defendant's posttrial motion, where he raised the fourth amendment claim citing *Carpenter*, the trial court denied the motion, stating, "I do think the application and order really works in place of the search warrant and complaint for search warrant" because the "application and order" were

supported by probable cause. Based on the above, we find defendant's claim asserting a fourth amendment violation is, at best, disingenuous.

¶ 54                                    C. Ineffective Assistance of Counsel

¶ 55        Finally, defendant contends his trial counsel rendered ineffective assistance when he failed to object to the admission of the Snapchat message. He claims the Snapchat message lacked proper authentication and, as a result, was inadmissible. We disagree.

¶ 56        Counsel may be found ineffective if the failure to move for the suppression of evidence was objectively unreasonable, given the state of the law at the time the motion would have been filed, and if that failure prejudiced defendant. *People v. Henderson*, 2013 IL 114040, ¶ 15; *People v. English*, 2013 IL 112890, ¶ 34; see also *Strickland v. Washington*, 466 U.S. 668 (1984). To show prejudice in this context, defendant must show both that the suppression argument counsel failed to raise was meritorious and that there is a reasonable probability that the outcome of the trial would have been different had the evidence been suppressed. *Henderson*, 2013 IL 114040, ¶ 15.

¶ 57        Regardless of any potential error, we conclude the outcome of defendant's trial would not have been any different had the trial court suppressed the "Snapchat message evidence." Although defendant does not make clear what specifically he considers the "Snapchat message evidence," we must assume it is solely the admission of the Snapchat message "Lac."

¶ 58        Bone testified he spoke with defendant on the phone when they were discussing the meeting place. Bone said: "Well, [defendant] said on the phone that it was going to be a white car. Then in Snapchat, he said a 'Lac.' " The surveillance video evidence showing a white Cadillac pull into the parking lot where Bone and Feldkamp were waiting was sufficient to identify the vehicle. The Snapchat message could be deemed insignificant in the eyes of the jury when the

- 15 -

jurors saw a white Cadillac as Bone had described. It was reasonable for the jury to believe Bone's testimony that it, in fact, was defendant in the vehicle given that the shooting occurred at a house that defendant had reason to know was vacant. As fully explained earlier in our decision, the jury was entitled to judge the credibility of Bone's testimony. The jury apparently believed Bone that it was defendant in the white Cadillac and, based upon the totality of the evidence, the jury's determination was not unreasonable. Defendant cannot demonstrate prejudice from the admission of the Snapchat message "Lac," in light of the overwhelming evidence otherwise suggesting his guilt. In other words, defendant cannot reasonably argue the outcome of the trial would have been different had the Snapchat evidence not been admitted.

¶ 59                                  III. CONCLUSION

¶ 60            For the foregoing reasons, we affirm the trial court's judgment.

¶ 61            Affirmed.