2022 IL App (1st) 191624-U

No. 1-19-1624

Filed March 10, 2022

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 92 CR 691-03 |
| KERRIE MAJOR, | ) ) | Honorable Vincent M. Gaughan |
| Petitioner-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Successive postconviction petition failed to make a colorable claim of actual innocence based on affidavit from codefendant that repeated petitioner's trial testimony and otherwise failed to put the trial evidence in a different light or undermine confidence in petitioner's guilt.

¶ 2    Kerrie Major appeals from the circuit court's denial of her motion for leave to file a successive postconviction petition that sought to challenge her 1995 conviction for two first degree murders, and related offenses, on the grounds of actual innocence. We affirm.[1]

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 3                                    I. BACKGROUND

¶ 4        Kerrie's[2] conviction stems from the horrific murders of mother Emma Jones and her 11-year-old daughter Diandra Jones. In 1991, Kerrie's brother, Sanantone Moss, was charged with sexually assaulting his ex-girlfriend's daughter, Diandra, who was 10 years old at the time of the assault. As he was being held in the Cook County jail awaiting trial, Sanantone telephoned his and Kerrie's sister, Orvette Major, and told her, "y'all got to get rid of them," referring to Emma and Diandra, as Sanantone did not want to "get the boot," meaning the electric chair.[3] Orvette told her and Kerrie's aunt, Danita Best, about Sanantone's request. Orvette later denied speaking with Kerrie about Sanantone's request, but admitted Kerrie was nearby when she spoke to Danita. In signed statements Kerrie gave to Assistant State's Attorneys (ASAs), she admitted she discussed "getting rid" of Emma and Diandra with her mother, Sandra Major, at some point.

¶ 5        Kerrie's family was acquainted with Emma and her family. According to Kerrie's statements, Kerrie went to Emma's apartment on the morning of November 23, 1991. Sandra and Danita were already there. Kerrie and Emma left to buy drugs, leaving Sandra and Danita with Diandra and Emma's 2-year-old son, Troy. When they returned to the apartment, Diandra was lying on a couch, covered by a blanket. Emma and Danita went to a bedroom. Sandra approached Kerrie and told her Diandra was dead. Kerrie went to check on Diandra and could not feel a pulse.

¶ 6        Kerrie and Sandra went to the bedroom where Emma and Danita had gone. Sandra appeared to mouth the words "come on," handed an electrical cord to Danita, and nodded her head toward Emma. Danita handed the cord to Kerrie and started stabbing Emma. Kerrie hit Emma in the head with a bottle. Then, Kerrie tried wrapping the cord around Emma's neck while Danita

_____

[2]Since this case involves several individuals with the same last names, we use first names after introduction.

[3]*People v. Moss*, 205 Ill. 2d 139, 145 (2001).

continued to stab her. As this was happening, Sandra held Troy, who was screaming. Sandra instructed Danita and Kerrie, "cover her mouth." Sandra and Danita both exclaimed, "b***, you ain't going to testify" to Emma. Emma begged for her life and pleaded that she would get the charges against Sanantone dropped.

¶ 7 Emma died in the bedroom. A medical examination revealed she received over 40 stab and puncture wounds to various parts of her torso, head, neck, and face, as well as dozens of abrasions. Similarly, Diandra was stabbed 9 times, mainly in the neck, and had numerous other abrasive wounds. The following day, November 24, 1991, police found Emma and Diandra's bodies under a mattress in a litter-strewn vacant lot. Troy was found in an alley naked, alone, and crying.

¶ 8 In her signed statements, Kerrie described how she assisted Sandra and Danita to dispose of the bodies. They also enlisted the help of James Patterson, who was Sandra's husband and Kerrie's stepfather. They wrapped the bodies in sheets and moved them through the building in a shopping cart. Then, they put the bodies in the trunk of James's car and dumped them in the vacant lot. They drove to another location where they abandoned Troy near a garbage can.

¶ 9 The presence of extensive blood found in the apartment, other parts of the building, and James's car was consistent with Kerrie's statements. A broken glass bottle and a bloody screwdriver were found in the apartment. Another relative, Cicilia Major, testified that she rode in the car when the bodies were transported and was told to "shut the f*** up" when she asked what was happening. Kerrie's younger sister, Rosalind Major, testified that Kerrie woke her early on the morning of November 23, 1991. Rosalind went with her on an unusual trip to a laundromat where they washed jackets belonging to Sandra and Kerrie. Orvette testified that Kerrie was within earshot when she conveyed Sanantone's request to Danita but denied speaking to Kerrie about it.

¶ 10        Kerrie testified at her bench trial. She related that she and Emma would get high together and she went to Emma's apartment the morning of November 23, 1991, for that purpose. She was aware that Sanantone was in jail at the time, charged with raping Diandra, and she was aware that Emma and Diandra would testify against Sanantone. She protested, however, that she was not aware than any harm would come to Emma or Diandra. And, contrary to her signed statements, she denied that she had discussed harming them with anyone. As in her signed statements, Kerrie testified that she and Emma went to buy drugs, leaving the others at the apartment and that, upon returning, she observed Diandra lying on the couch, covered with a blanket. Differing from her earlier statements, Kerrie testified that Danita began fighting with Emma after a dispute about Emma's distribution of the drugs. Danita pushed Emma, drew a knife, and began stabbing her. Upon Danita's instruction, Kerrie picked up a bottle and hit Emma over the head with it. Likewise, Kerrie testified that she was following Danita's instruction when she tried wrapping a cord around Emma's neck. Sandra and Danita shouted, "b***, you won't testify" during the attack. Consistent with her prior statements and the testimonies of Cicilia and Rosalind, Kerrie testified to the disposal of the bodies and taking bloodstained jackets to the laundromat.

¶ 11        The court found Kerrie guilty of the first degree murder of Emma, commenting that the evidence established Kerrie actively and directly participated in killing her. As to Diandra's murder, the court found that Kerrie was guilty under an accountability theory. The court noted that Kerrie's lack of reaction to learning that Diandra was dead, coupled with the fact that Diandra's killing occurred when she took Emma away from the apartment and that she later participated in killing Emma, belied that Kerrie did not play a part in Diandra's killing. The court also found Kerrie guilty of concealing the bodies, the aggravated kidnapping and unlawful restraint of Troy,

and a count of armed violence. The court sentenced Kerrie to natural life imprisonment on the murder convictions and lesser terms for the other offenses.[4]

¶ 12    On direct appeal, the State confessed error and agreed that the aggravated kidnapping count should be vacated under the one-act, one-crime principle as the same act supported the armed violence conviction. No other arguments were raised, and the conviction was affirmed. *People v. Major*, No. 1-96-1127 (unpublished order filed Apr. 24, 1997).

¶ 13    In 2001, Kerrie filed a postconviction petition claiming her natural life sentences violated the right-to-trial principles of the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The circuit court summarily dismissed the petition. On appeal, Kerrie abandoned her *Apprendi* claim and instead asserted that her appellate counsel was ineffective for failing to challenge the sufficiency of the evidence to support her conviction for Diandra's murder. This court rejected the claim, as it was raised for the first time on appeal. *People v. Major*, No. 1-01-1235 (unpublished order filed Aug. 22, 2003).

¶ 14    In 2019, Kerrie, acting *pro se*, filed the motion for leave to file a successive postconviction petition, along with the proposed petition, at issue in this appeal. She asserted that she was actually innocent of Diandra's murder and that her trial and appellate counsel were ineffective regarding calling witnesses in her defense, waiving her right to a jury trial, and seeking lesser charges. The actual innocence claim was based on an affidavit of Danita Best, which attested as follows: "[Kerrie] was not present when 11 year old Diandra Jones was murdered nor did she know that Diandra was in any danger." In her own affidavits, Kerrie averred that Sanantone never spoke to her while he was in jail, Orvette never told her about his phone calls, that she did not agree to nor

---

[4]In a separate case, Sanantone was convicted of the aggravated sexual assault of Diandra J. *People v. Moss*, 275 Ill. App. 3d 748 (1995). He was also convicted for soliciting the first degree murders of Emma J. and Diandra J. and was sentenced to death. *People v. Moss*, 205 Ill. 2d 139 (2001). Governor Ryan later commuted his sentence to natural life imprisonment as part of a mass commutation in 2003.

was she aware of any plan regarding Emma and Diandra, she was not present when Diandra was killed, and not aware that Diandra would be harmed.

¶ 15    In a written order, the circuit court found that Kerrie's assertion of actual innocence repeated the substance of her trial testimony that she was not aware Diandra would be murdered and not present when it occurred. Thus, the court did not find Danita's affidavit newly discovered or noncumulative of trial evidence. In addition, the court reasoned that the affidavit did not negate Kerrie's accountability for Diandra's murder and thus lacked the conclusive character to change the result on retrial. The court concluded that the petition failed to make a colorable claim of actual innocence and separately stated reasons why Kerrie's ineffectiveness claims did not warrant the filing of a successive petition. Ultimately, the court denied Kerrie's motion for leave to file a successive postconviction petition. Kerrie filed a timely notice of appeal.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, Kerrie argues that she was entitled to file a successive petition as she made a colorable claim of actual innocence. She does not advance arguments regarding her other *pro se* claims.

¶ 18    The Postconviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 2018)) enables a defendant to collaterally attack their conviction based on constitutional violations in the proceedings that resulted in the conviction. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act provides for the filing of a single petition as of right and any successive petition only upon obtaining leave of court. *Id*. ¶ 22. A petitioner should be permitted leave to file a successive petition in only two circumstances: (1) when the petition makes a colorable claim of actual innocence or (2) when the petitioner demonstrates cause for failing to include a successive claim of trial error in their initial petition and prejudice resulting from the omission. *Id*. ¶¶ 22-23.

¶ 19        To make a colorable claim of actual innocence, the claim must be supported by evidence that is (1) newly discovered, (2) not cumulative to evidence presented at trial, (3) material, and (4) of such conclusive character that it would probably change the result upon retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Evidence is newly discovered if it could not through due diligence have been discovered before trial. *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is noncumulative if it "adds to the information that the fact finder heard at trial." *Robinson*, 2020 IL 123849, ¶ 47. Material means the evidence is relevant and probative of the petitioner's innocence. *Coleman*, 2013 IL 113307, ¶ 96. And such evidence is of conclusive character if, when considered along with the evidence presented at the original trial, the evidence would probably lead to a different result on retrial. *People v. Taliani*, 2021 IL 125891, ¶ 59. The conclusive character of new evidence is the most important element. *Robinson*, 2020 IL 123849, ¶ 47. The ultimate question in this analysis is "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id*. ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97). Upon a circuit court's denial of a motion for leave to file a successive petition asserting actual innocence, we review *de novo* whether a petitioner has made a colorable claim of actual innocence. *Id*. ¶ 40.

¶ 20        Here, the evidence offered to support Kerrie's claim of actual innocence regarding Diandra's murder is an affidavit from Danita who, as the trial evidence indicated, fatally stabbed Diandra while Kerrie and Emma were away from the apartment. Danita's scant affidavit states, "[Kerrie] was not present when 11 year old Diandra Jones was murdered nor did she know that Diandra was in any danger." The first part of Danita's statement, that Kerrie was not present when Diandra was murdered, is not new information or material to Kerrie's guilt or innocence. Kerrie's signed statements given to the ASA's and her trial testimony both asserted that she left the

apartment with Emma and, only upon her return, observed Diandra lying covered on the couch and learned that she was dead. No evidence suggested that Kerrie was present when Diandra was murdered.

¶ 21 Kerrie's absence when Diandra was murdered, moreover, is not probative of her innocence since her guilt follows from her accountability for the murder. A person is legally accountable for the criminal conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 1990). "[T]he State may prove a defendant's intent to promote or facilitate an offense by showing *either* (1) that the defendant shared the criminal intent of the principal, *or* (2) that there was a common criminal design." (Emphasis in original.) *People v. Fernandez*, 2014 IL 115527, ¶ 21. In finding Kerrie guilty of Diandra's murder, the trial court noted that Kerrie did not exhibit the kind of reaction upon learning that Diandra was dead that one would expect of an innocent person. More significant, Kerrie proceeded to participate in Emma's murder and disposing of the bodies. Considering those facts and circumstances, the court inferred that Kerrie facilitated Diandra's murder by getting Emma out of the apartment, thereby leaving Diandra without her mother to protect her. The court implicitly rejected Kerrie's testimony that she was not aware any harm would come to Diandra or Emma that day.

¶ 22 Kerrie seeks to reverse the trial court's determination of her accountability for Diandra's murder with Danita's averment that Kerrie did not "know that Diandra was in any danger." For multiple reasons, this fails to make a colorable claim of actual innocence. We find Danita's affidavit conclusory since no facts are provided to indicate how the averment that Kerrie did not know that Diandra was in danger could be true. Conclusory statements without specific facts

asserted in affidavits supporting a postconviction petition are not well-pleaded facts. *People v. Smith*, 2021 IL App (1st) 181728, ¶ 55 (McBride, J., dissenting). Likewise, Danita's bare averment lacks conclusive character since it does not foreclose that Kerrie was aware of an intent to harm Diandra without Danita's knowledge. Indeed, Kerrie's signed statements indicated that she discussed "getting rid" of Emma and Diandra with Sandra before November 23, 1991. Nothing indicated that Danita was present for that conversation, nor does she provide a basis to support that it did not occur. Those considerations aside, the affidavit merely repeats Kerrie's protestations from her trial testimony and signed statements that she was not aware Emma or Diandra would be harmed. It does not add to "the information the fact finder heard at trial." *Robinson*, 2020 IL 123849, ¶ 47. Thus, the affidavit is cumulative. In a retrial, it would do no more than ask a fact finder to reevaluate essentially the same evidence from the original trial. We could affirm for this reason alone.

¶ 23       Nonetheless, we observe that the affidavit does not place the trial evidence in a different light or undermine our confidence in the judgment of guilt. Taking that Kerrie did not know Diandra was in any danger as true would, at most, refute that Kerrie had a specific intent to promote or facilitate Diandra's murder. But that would not defeat Kerrie's accountability. *Fernandez*, 2014 IL 115527, ¶ 21 (rejecting that "a defendant may never be held accountable for a crime that he did not specifically intend to promote or facilitate."); see also *People v Jackson*, 2020 IL App (4th) 170036, ¶ 41 (shared intent to commit a specific crime is not an element of accountability based on a common criminal design). The trial evidence showed that Kerrie was aware Sanantone was in jail, charged with raping Diandra, and she knew Emma and Diandra would testify against him. In her signed statements, she admitted that she discussed "getting rid" of Emma and Diandra with Sandra at some point before the murders. Without hesitation, Kerrie joined in the brutal attack on

Emma, hitting her with a bottle and wrapping a cord around her neck. She then proceeded to assist with transporting the bodies and dumping them in a vacant lot. "Evidence that a defendant voluntarily attached [her]self to a group bent on illegal acts with knowledge of its design supports an inference that [s]he shared the common purpose and will sustain h[er] conviction for an offense committed by another." *Fernandez*, 2014 IL 115527, ¶ 13. Kerrie voluntarily attached herself to the group with the common purpose of preventing Emma and Diandra from testifying against Sanantone in whatever way "getting rid" of them would entail. It is of no moment whether Kerrie was specifically aware that Danita would kill Diandra when Kerrie left the apartment with Emma. The focus is on whether Kerrie was part of the group with a common purpose, not on whether she intended any particular crime to occur. *Jackson*, 2020 IL App (4th) 170036, ¶ 45. "[E]ven if a defendant is completely unaware of h[er] codefendant's true intentions, [s]he is still legally accountable for any crimes committed by the group to which the defendant had attached [her]self, knowing that the group was bent on illegal acts."

¶ 24                      III. CONCLUSION

¶ 25        Based on the foregoing, we find that the petitioner failed to make a colorable claim of actual innocence. Accordingly, we affirm the circuit court's denial of leave to file a successive postconviction petition.

¶ 26        Affirmed.